No. 99-420

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 361

**303 Mont. 349**

**16 P. 3d 345**

IN RE THE MARRIAGE OF
DAVID LEROY ROLF,

Petitioner and Appellant,


and


CHRISTINE MARIE ROLF,

Respondent and Respondent.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Evonne Smith Wells, Laurence J. Ginnings, Missoula, Montana

For Respondent:

Terry L. Wolfe, Sol & Wolfe Law Firm, Missoula, Montana

Submitted on Briefs: December 9, 1999

Decided: December 27, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 David Leroy Rolf (David) appeals a determination of the District Court for the Fourth Judicial District, Missoula County, awarding marital assets to his former spouse, Christine Marie Rolf (Christine), in an amount different than what the parties had already agreed to in writing. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶2 David raises the following issues on appeal:

¶3 1. Whether the District Court erred in failing to enforce the written agreement entered into by the parties in January 1998.

¶4 2. Whether the District Court erred in considering the parties' premarital cohabitation in apportioning the marital estate.

¶5 3. Whether the District Court failed to equitably apportion the marital assets.

¶6 In addition, Christine requests that we assess Rule 32, M.R.Civ.P. sanctions against David for filing a frivolous appeal and for utilizing "his superior financial position to leverage Chris into a settlement disadvantageous to her."

**Factual and Procedural Background**

¶7 David and Christine met in mid-1993 in Arizona. They lived together there from February 1994 to June 1995. Sometime in early 1995, David purchased residential and ranch property in the Bitterroot Valley in Montana.

¶8 In June 1995, Christine obtained a leave of absence from her employment with Scottsdale Memorial Hospital in Arizona, sold her horse and car, and moved with David to Montana to share the home he had purchased. However, Christine left the relationship in August 1996 and returned to Arizona regaining her employment with Scottsdale Memorial Hospital. David followed Christine to Arizona and convinced her to marry him and return to Montana. Both David and Christine later testified that David promised to place $10,000 into an account accessible to Christine to ensure that she would have funds to live on temporarily if the marriage fell apart.

¶9 David and Christine were married on November 29, 1996, in Glendale, Arizona. This was David's second marriage and Christine's third marriage. The couple had no children together, but David has grown children from his previous marriage and Christine has grown children from her first marriage and two minor children from her second marriage.

¶10 David had a net worth of nearly $1,000,000 prior to the marriage. Among the premarital assets was the property in the Bitterroot Valley that David purchased in 1995. It is undisputed that Christine did not contribute to the purchase price of this property and that she did not bring any substantial assets to the marriage.

¶11 Prior to returning to Montana with David, Christine, rather than taking a leave of absence, terminated her employment with the hospital in Arizona. Christine contended that she was essentially debt free at the time of the marriage having sold her automobile and her horse prior to moving to Montana and having applied the proceeds of the sale to her debts. David contended that Christine was in debt at the time of their marriage and that a considerable portion of that debt consisted of loans David made to Christine prior to the marriage.

¶12 During the marriage, Christine operated two home-based businesses, one involving medical billing, and one making and selling tamales. David owned a clean room technology business.

¶13 David and Christine experienced marital difficulties soon after their marriage. They separated in January 1998, and on January 28, 1998, they entered into the following agreement:

   1. Chris Rolf gets 100% of AMB--not owing David Rolf anything for AMB.

2. David Rolf agrees to give Chris Rolf $10,000 in cash.

3. Chris Rolf does not owe Dave Rolf any other monies.

4. Chris Rolf will take all of her own possessions.

5. Dave Rolf agrees to never have any personal contact with Chris Rolf after Divorce.

6. Dave Rolf owes Chris Rolf no other monies.

The agreement was handwritten by Christine and signed by both parties. AMB refers to the medical billing company operated by Christine and her daughter.

¶14 On February 4, 1998, David filed a petition for dissolution of the marriage wherein he expressed his willingness to forgive certain debts owed to David by Christine and to pay Christine $3,000 unless the parties reached a different agreement. Christine filed a motion for temporary maintenance on February 18, 1998, and on March 13, 1998, David filed a motion to enforce the January 28, 1998 agreement which did not provide for maintenance. Hearings on these motions were held on May 14, 1998 and July 1, 1998.

¶15 Prior to the hearings, Christine and David attempted unsuccessfully to reconcile. The reconciliation was contingent upon David and Christine entering into an postnuptial agreement. [1] While both David and Christine signed the agreement, Christine's attorney refused to sign off on the agreement until Christine had undergone a period of counseling. David refused and the agreement was never finalized. Christine did subsequently see a licensed clinical counselor to help her deal with various physical and emotional problems she experienced as a result of her relationship with David.

¶16 On August 11, 1998, the District Court entered its Findings of Fact, Conclusions of Law and Order wherein the court stated:

15. The purported agreements entered into by the parties were not of a final nature, were altered by the actions of the parties (e.g., via reconciliation), and/or were the product of coercion and domination. As such, the agreements are not found to be unconscionable, and are rejected by the Court.

¶17 Trial was conducted on February 4, 1999, and, on April 2, 1999, the District Court entered its Findings of Fact, Conclusions of Law and Decree of Dissolution wherein the court awarded Christine $80,000 of the value of the Bitterroot Valley home, a Ford Bronco, a horse, the medical billing business and various items of personal property. The court also ordered that David pay $3,000 in credit card debt, Christine's outstanding debt to her therapist in the amount of $1,200, and $4000 to Christine's therapist for future therapy sessions. David appealed.

¶18 On August 17, 2000, we remanded to the District Court for clarification of the court's order regarding the parties' January 28, 1998 agreement. Thereafter, the court amended its August 11, 1998 Findings of Fact, Conclusions of Law, and Order to find that the agreement is unconscionable. The court did not issue any additional findings or conclusions.

## Issue 1.

¶19 *Whether the District Court erred in failing to enforce the written agreement entered into by the parties in January 1998.*

¶20 When a district court determines the unconscionability of a marital and property settlement agreement, it

> engage[s] in discretionary action which cannot be accurately categorized as either a finding of fact or a conclusion of law. These discretionary judgments made by the trial court are presumed to be correct and will not be disturbed by this Court absent an abuse of discretion by the lower court.

*In re Marriage of Bukacek (1995), 274 Mont. 98, 103, 907 P.2d 931, 934 (quoting In re Marriage of Caras (1994), 263 Mont. 377, 380-81, 868 P.2d 615, 617; In re Marriage of Hamilton (1992), 254 Mont. 31, 36, 835 P.2d 702, 704-05).*

¶21 The District Court determined in this case that the January 28, 1998 agreement was not of a final nature; was altered by the actions of the parties, i.e., via reconciliation; and was the product of coercion and domination. Consequently, the court found that the agreement was unconscionable.

¶22 David argues that the agreement was not unconscionable given the short duration of the marriage and the disparity between the assets David brought to the marriage and the

assets Christine brought to the marriage. David contends that because the agreement was drafted by lay persons rather than attorneys, they should not be held to the same standard of expertise as are attorneys when drafting agreements. Moreover, David maintains that there is nothing ambiguous about the language used by the parties and, because the terms of the agreement are simple, explicit and understandable, he contends that the District Court should have enforced the agreement.

¶23 Christine contends that if David had intended this agreement to be final in nature, he would not have requested different terms in his Petition for Dissolution, nor would he have referred in his petition to the "possibility" of their reaching an agreement. Christine argues that rather than being a final agreement, the January 28, 1998 agreement actually reinstates the arrangement they had prior to their marriage wherein David agreed to set aside $10,000 for Christine, in case the marriage did not work out, so that Christine could have some operating funds with which to move out, pay her interim expenses, and obtain an attorney.

¶24 Moreover, Christine points out that in his Petition for Dissolution, David expressed his willingness to consider and negotiate other terms for a final settlement if Christine would not accept the terms he offered in his petition. It was not until after Christine filed for temporary maintenance that David asserted that a final settlement agreement had already been executed by the parties.

¶25 Under Montana law, property settlement agreements are considered contracts and must be construed under the law of contracts. *In re Marriage of Woodford* (1992), 254 Mont. 501, 504, 839 P.2d 574, 576 (citing *In re Marriage of Quinn* (1981), 191 Mont. 133, 136, 622 P.2d 230, 232; § 40-4-201(5), MCA). *See also Heath v. Heath* (1995), 272 Mont. 522, 527, 901 P.2d 590, 593. If the language of a property settlement agreement is clear and explicit, it controls the agreement's interpretation. *Woodford*, 254 Mont. at 505, 839 P.2d at 576.

¶26 This Court has stated that "[s]ince consent is an essential element of a contract, § 28-2-102, MCA, and consent is not mutual unless all the parties agree upon the same thing in the same sense, § 28-2-303, MCA, the extent and nature of the parties' consents to the property settlement agreement are questions of fact which must be first determined." *Soha v. West* (1981), 196 Mont. 95, 99, 637 P.2d 1185, 1188 *overruled on other grounds by Eschler v. Eschler* (1993), 257 Mont. 360, 849 P.2d 196. Moreover, pursuant to § 28-2-401, MCA, an apparent consent is not free when obtained through duress, menace, fraud,

undue influence, or mistake.

¶27 While we agree with David's contention that the handwritten agreement was not abrogated by reconciliation of the parties because the reconciliation was conditional upon entering into a postnuptial agreement which the parties never did, the facts in this case bring into question the validity of the agreement as a final agreement. First, in his Petition for Dissolution, filed only one week after he signed the handwritten agreement, David prefaced his proposals as to the distribution of property with the statement: "If the parties are unable to reach an agreement as to division of property and indebtedness, . . ." Second, it is no coincidence that the amount mentioned in the parties' January 28, 1998 agreement is the

same amount that the parties testified David was to place into a bank account in Christine's name at the time of their marriage to ensure that Christine would have funds to live on temporarily if the marriage fell apart. Third, both parties had been married and divorced previously and it is no stretch of the imagination that Christine would not have considered the agreement final until she had a chance to review it with her attorney. Fourth, the agreement is ambiguous in that it does not state that it is either a temporary agreement or a final agreement. Consequently, we agree with the District Court's finding that there was no meeting of the minds regarding final settlement terms.

¶28 Moreover, under § 40-4-201(2), MCA, "the terms of the separation agreement . . . are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties . . . that the separation agreement is unconscionable." Here, the economic disparity between the parties allowed David to take unfair advantage of Christine's situation.

¶29 Accordingly, we hold that the District Court did not err in failing to enforce the handwritten agreement entered into by the parties on January 28, 1998, as the parties' final settlement agreement.

## Issue 2.

¶30 *Whether the District Court erred in considering the parties' premarital cohabitation in apportioning the marital estate.*

¶31 David contends that the District Court erroneously included a period of premarital cohabitation within the term of the marriage in making its property division and that

Montana law does not permit consideration of premarital living arrangements in an action for dissolution of marriage. David points to the fact that in its April 2, 1999 Findings of Fact, Conclusions of Law and Decree of Dissolution, the District Court stated:

> 14. The parties established a marital relationship as early as June, 1995 when they co-habitated in the Florence home, brought David's children to Montana to reside as a family, and did not correct the impression given to friends and neighbors that they were husband and wife.

David argues that roughly four pages of the District Court's April 2, 1999 findings are concerned with the period of premarital cohabitation and that it had an impact upon the ultimate findings and conclusions of the court regarding the property division.

¶32 Christine contends, on the other hand, that premarital actions and contributions may be relevant in an appropriate case. She maintains that her history of involvement in David's business venture in Arizona prior to and during the marriage, her contributions as a homemaker, and her outside employment during the premarital relationship, are all useful in helping the court to understand the parties' marital relationship.

¶33 Contrary to David's assertions, the District Court did not find that a common law marriage had been established. Rather, the court noted that "[w]hile this relationship might not rise to the level of a common law marriage beginning June, 1995, it would be wholly inequitable for the Court to disregard the relationship of the parties as it existed from February of 1994 and especially from June, 1995 when the parties relocated to Florence, Montana."

¶34 Section 40-4-202, MCA, sets forth the guidelines a district court must follow in distributing property as part of a marriage dissolution and lists the factors the court shall take into consideration in making an equitable distribution. This statute provides in relevant part:

> In a proceeding for dissolution of a marriage . . . the court . . . shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both. In making apportionment, the court shall consider the duration of the marriage and prior marriage of either party; the age, health, station, occupation, amount and sources of income, vocational skills, employability,

estate, liabilities, and needs of each of the parties; custodial provisions; whether the apportionment is in lieu of or in addition to maintenance; and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit.

Section 40-4-202, MCA.

¶35 The District Court's findings in this case reflect that the court considered, among other things, the duration of the marriage as well as the length of the parties' relationship; the extent of the parties' assets; their health, occupation, amount and sources of income; the needs of each of the parties; the opportunity of each for future acquisition of capital assets and income; and Christine's contributions as a homemaker, all of which are consistent with § 40-4-202, MCA.

¶36 Moreover, while it would be inappropriate to consider the parties' premarital cohabitation as part of the term of the marriage itself, it was necessary in this case for the District Court to consider the parties' premarital history to aid in determining which party brought what assets into the marriage.

¶37 Accordingly, we hold that the District Court did not err in considering the parties' premarital cohabitation in apportioning the marital estate.

### Issue 3.

¶38 *Whether the District Court failed to equitably apportion the marital assets.*

¶39 We review a district court's division of marital property to determine whether the findings on which the court relied are clearly erroneous. *In re Marriage of Engen*, 1998 MT 153, ¶ 26, 289 Mont. 299, ¶ 26, 961 P.2d 738, ¶ 26 (citing *In re Marriage of Stufft* (1996), 276 Mont. 454, 459, 916 P.2d 767, 770). If the findings are not clearly erroneous, we will affirm the distribution of property unless the court abused its discretion. *Engen*, ¶ 26 (citing *Stufft*, 276 Mont. at 459, 916 P.2d at 770). *See also In re Marriage of Hogstad* (1996), 275 Mont. 489, 496, 914 P.2d 584, 588; *In re Marriage of Smith* (1995), 270 Mont. 263, 267-68, 891 P.2d 522, 525. The test for an abuse of discretion in a marital dissolution proceeding is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial

injustice. *Engen*, ¶ 26 (citing *In re Marriage of Meeks* (1996), 276 Mont. 237, 242, 915 P.2d 831, 834).

¶40 In addition, we review a district court's interpretation of the law to determine whether the court's interpretation is correct. *Hayes v. Hayes* (1994), 264 Mont. 350, 352, 871 P.2d 913, 914 (citing *Steer Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603).

¶41 The District Court determined in this case that the marital estate had accumulated $78,778.49 in assets during the term of the marriage and that Christine had contributed to this increase largely by her contributions as a homemaker. The court further found that the only major asset to which Christine has a significant connection is the marital home in the Bitterroot Valley. The District Court awarded Christine $80,000 from the value of the home, $2,000 for a misplaced necklace, $1,200 for past counseling expenses, $4,000 for future counseling expenses, $3,000 for outstanding credit card debt, the Ford Bronco, a horse, the medical billing business, and various items of personal property. The District Court found that an award of maintenance was inappropriate in this matter in view of the court's allocation of property.

¶42 David argues that the Bitterroot Valley home should not have been included in the marital estate as it is undisputed that the home was acquired by David prior to the marriage and solely from his assets. David further argues that even if the residence were included in the marital estate, the District Court's property division was grossly inequitable as the court awarded Christine an amount in excess of what the court determined was the entire appreciated value of the marital estate rather than an equitable share of any appreciated value, which David contends there was none. David claims that the value of the home at the date of the marriage was estimated to be $229,680 and that Christine's expert estimated the value of the residence at the time of dissolution at $223,900, thus there was no increase in value during the term of the marriage.

¶43 Christine claims that David's argument fails to consider that the parties' estate was valued at nearly $1,000,000 and that the court awarded Christine only $80,000 from the major asset which Christine and David shared, that being the home. Christine contends that the remainder of the award provides her with a vehicle and a horse, both of which restore property she had previously given up as a result of her relocating to Montana with David.

¶44 Christine argues that considering she gave up a significantly better paying position with nine years seniority, retirement and other benefits; she relocated to Montana based on David's promises; and that she has insufficient income or property to sustain herself otherwise, the District Court's distribution is equitable and should be sustained. David argues that Christine is asking to be compensated for her loss of lifestyle--a lifestyle that existed for her in Arizona, but does not exist for her in Montana where she has elected to reside.

¶45 Section 40-4-202, MCA, sets forth the guidelines for distributing preacquired or gifted property as part of a marriage dissolution:

> In dividing property acquired prior to the marriage; property acquired by gift, bequest, devise, or descent; property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:
>
> (a) the nonmonetary contribution of a homemaker;
>
> (b) the extent to which such contributions have facilitated the maintenance of this property; and
>
> (c) whether or not the property division serves as an alternative to maintenance arrangements.

¶46 This Court has previously construed this provision to mean that regardless of who holds title, preacquired or gifted property need not be included in the marital estate unless the nonacquiring spouse contributed to its preservation or appreciation. *Engen*, ¶ 29. In the event the nonacquiring spouse did contribute to the property's preservation or appreciation, we have held that the nonacquiring spouse is entitled to an equitable share of the appreciated or preserved value which is attributable to his or her efforts. *Engen*, ¶ 29 (citations omitted). "Those assets belonging to a spouse prior to a marriage, or acquired by gift, bequest, devise, or descent during the marriage are not part of the marital estate unless the spouse made contributions in the preservation or interest in that property." *In re Marriage of Nordberg* (1994), 265 Mont. 352, 361, 877 P.2d 987, 992 (citing *In re Marriage of Smith* (1994), 264 Mont. 306, 312, 871 P.2d 884, 887-88).

¶47 Moreover, if gifted or preacquired assets have not appreciated during a marriage, their value at the dissolution of the marriage cannot be considered a contribution from the marital effort. *In re Marriage of Goodman* (1986), 222 Mont. 446, 449, 723 P.2d 219, 221 (citing *In re Marriage of Balsam* (1979), 180 Mont. 129, 134, 589 P.2d 652, 654).

¶48 In the case *sub judice*, while Christine did contribute to the home as a homemaker during the 14 months of the parties' marriage, there is no evidence that the home increased in value during that time or as a result of her efforts. Rather, the evidence adduced at trial shows that the property was worth less at the time of dissolution than what David paid for it in 1995.

¶49 In addition, Christine offered several documents into evidence to support her testimony that the marital estate had increased in value during the term of the marriage. The District Court used these documents to arrive at its finding in its April 2, 1999 decree that the marital estate had accumulated $78,778.49 in assets consisting mainly of "the value of horses, savings and retirement." The court, however, did not make any findings as to any appreciated value of the home. Moreover, those same documents show that while the value of horses, savings and retirement had increased by that amount, other assets had markedly decreased, thus supporting David's contention that the increase in value of the horses, savings and retirement were in part due to a shifting of assets.

¶50 Therefore, we hold that the District Court abused its discretion when it included the Bitterroot Valley home in the marital estate and awarded a portion of the value of the home to Christine without a finding that the home had appreciated in value during the term of the marriage and that Christine's contributions "facilitated the maintenance of this property" or that the property division "serve[d] as an alternative to maintenance arrangements." Section 40-4-202, MCA.

¶51 David also objects to the District Court's award of $2,000 to Christine for a missing necklace. David argues that the only evidence of the necklace or its value is Christine's uncorroborated testimony. The District Court determined that because the necklace has never been returned to Christine and because "David had primary control of the marital residence when the necklace disappeared and has previously demonstrated his ability to use personal property and finances for manipulative purposes, he should be required to reimburse Chris the value of the misplaced necklace."

¶52 We have repeatedly held that the trial court sits in the best position to judge the

credibility of the testimony proffered by the parties to a dissolution action and that because the trial court has had the opportunity to observe the demeanor of those witnesses, we will defer to its resolution of any conflicting evidence. *In re Marriage of Porter* (1991), 247 Mont. 395, 398, 807 P.2d 192, 194. *See also Engen*, ¶ 46. "Unless an abuse of discretion can be shown, we will not disturb the district court's findings concerning the valuation of property, even if the evidence conflicts, *as long as those findings are based on substantial credible evidence.*" *Porter,* 274 Mont. at 398, 807 P.2d at 194 (emphasis added) (citing *In re Marriage of Milesnick* (1988), 235 Mont. 88, 95, 765 P.2d 751, 755).

¶53 The only evidence regarding the necklace is Christine's testimony:

> A. And I don't want to forget about the necklace that he stole from me. I want that back.
>
> Q. What was the value of that?
>
> A. About $2,000.00.

We conclude that, in this case, there is not substantial evidence to support the District Court's finding of the value of the necklace or that David is in possession of the necklace. Hence, we reverse the District Court on this issue.

¶54 David also objects to the award of the Ford Bronco to Christine. He claims that he purchased the Ford Bronco four years prior to the marriage and that at the time of dissolution it was worth $15,000. He argues that the evidence shows Christine sold the car she owned prior to their marriage for $3,000 and used the proceeds to reduce her personal debts. Hence, David argues that it was error for the court to award the Ford Bronco to Christine because she did not contribute to its preservation or appreciation and, in fact, the car depreciated in value during their marriage.

¶55 There was no evidence introduced at trial that Christine made any contribution to the purchase of the Ford Bronco prior to the marriage or to the preservation or appreciation of the Ford Bronco during the marriage. Therefore, we hold that the District Court abused its discretion when it included the Ford Bronco in the marital estate and awarded it to Christine without a finding that it had appreciated in value during the term of the marriage and that Christine's contributions "facilitated the maintenance of" the Ford Bronco or that the award of the Ford Bronco "serve[d] as an alternative to maintenance arrangements."

Section 40-4-202, MCA.

¶56 Accordingly, we reverse and we remand to the District Court for a determination, consistent with this opinion, of the appreciated value of the marital assets and an equitable distribution of the appreciated value of those assets.

## Sanctions

¶57 Christine argues that we should order David to pay her reasonable attorney's fees on appeal because David's appeal of the District Court's judgment denying the existence of a final settlement agreement was frivolous. Christine also argues that sanctions are in order in the way of attorney's fees because "a review of the record makes it apparent that David has continually attempted to utilize his superior financial position to leverage Chris into a settlement disadvantageous to her."

¶58 Our ability to impose sanctions on appeal in a civil case stems from Rule 32, M.R. App.P., which provides:

> If the supreme court is satisfied from the record and the presentation of the appeal in a civil case that the same was taken without substantial or reasonable grounds, such damages may be assessed on determination thereof as under the circumstances are deemed proper.

Because we conclude that there were reasonable grounds for David's appeal, as evidenced by our reversal of the District Court in David's favor on the issue of the apportioning of the marital assets, we cannot and will not impose sanctions on appeal in this case.

¶59 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

1. The agreement, written by David, is incorrectly titled: "Antenuptial Agreement."