No. 01-394

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 309

IN RE THE MARRIAGE OF

JAMES STEINBEISSER,

Petitioner and Appellant,

and

JACKIE STEINBEISSER,

Respondent, Respondent and Cross-Appellant.

**FILED**

DEC 1 2 2002

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Seventh Judicial District,
In and for the County of Richland,
The Honorable David Cybulski, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

W. Corbin Howard, Attorney at Law, Billings, Montana

Phillip N. Carter, Attorney at Law, Sidney, Montana

For Respondent:

Laura Christoffersen, Christoffersen & Knierim, P.C., Culbertson, Montana

Submitted on Briefs:   March 14, 2002

Decided:   December 12, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Petitioner, James Steinbeisser (Jim), filed a petition for dissolution of his marriage to Respondent, Jackie Steinbeisser, in the District Court for the Seventh Judicial District in Richland County. Following trial, the District Court entered its Findings of Fact, Conclusions of Law, and Decree of Dissolution. Jim appeals the District Court's distribution of property and award of attorney fees to Jackie. Jackie cross-appeals the District Court's consideration of certain family debt in the computation of Jim's net worth. We reverse the judgment of the District Court.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err in its valuation of the premarital and marital assets?

¶4 2. Did the District Court err when it valued Jackie's financial contribution to the marital estate?

¶5 3. Did the District Court err when it required Jim to reimburse Jackie for the entire amount of her inheritance?

¶6 4. Did the District Court err when it found that Jackie gave up her teaching career for the marriage?

¶7 5. Did the District Court err when it awarded Jackie two-thirds of the appreciated value of Jim's pre-acquired property?

¶8 6. Did the District Court err when it awarded attorney fees to Jackie?

¶9 7. Did the District Court err when it reduced the divisible marital estate on account of premarital debt that Jim purportedly failed to disclose prior to trial?

2

## FACTUAL AND PROCEDURAL BACKGROUND

¶10 On February 11, 1994, Jim and Jackie were married in Sidney, Montana. Jim was 34 years of age and Jackie was 52 years of age when the parties married. Aside from a two-year stint in Williston, North Dakota, to attend junior college, Jim has farmed and ranched in Richland County, Montana, throughout his lifetime. Initially, Jim worked for Steinbeisser and Sons, Inc., on his family's farm and ranch. In the mid 1980s, Jim, his two brothers, and two of his cousins borrowed money from their family to purchase their own farming and ranching operation. They formed a partnership, 5 S Partnership, which owned the land and established a corporation, VS, Inc., to operate the farm and ranch. In 1990, Jim purchased an apartment complex for $41,000, which he intended to utilize as rental property. Jim entered the marriage with the rental property, a 1/5 undivided interest in 5 S Partnership and VS, Inc., and some other property discussed in greater detail below.

¶11 Prior to the marriage to Jim, Jackie worked as a substitute teacher in the Sidney, Montana, school system while she renewed her teaching certificate. Thereafter, Jackie taught full time at a rural school during the 1992-93 school year. Jackie entered into the marriage with $12,615.73 in an investment account, $1100 in an IRA, a vehicle worth $5000, and a mineral interest and personal property worth nominal sums. Further, Jackie received one thousand dollars a month in maintenance from a previous marriage during the first twenty-two months of her marriage to Jim.

¶12 During the marriage, the parties worked in various capacities on the farm and ranch owned by the 5 S Partnership. Jackie did not return to teaching following the 1992-93 school

3

year and her teaching certification has since expired. Neither party maintained employment off of the farm and ranch. However, both Jim and Jackie remained actively involved with the Montana Farm Bureau throughout the marriage in volunteer capacities. Further, Jackie assumed responsibility for the management of Jim's apartment complex.

¶13 Each of the parties inherited property during the marriage. Jackie inherited a house from her aunt which she sold for $51,261.73. With Jackie's inheritance money, the parties paid off a portion of the apartment complex's mortgage, purchased stock, and placed the remainder in a joint savings account. In 1999, Jim inherited a minority interest in Steinbeisser & Sons, Inc., from his grandmother, valued at approximately $52,000. The parties did accumulate joint property during the course of the marriage which will be discussed in greater detail below as necessary.

¶14 On November 12, 1999, Jim filed a petition for dissolution with the District Court. The matter proceeded to trial on January 4, 2001. Because no children were born during the marriage, the dispute at trial primarily involved the valuation and distribution of the parties' premarital and marital assets. Jim relied on expert testimony from two appraisers to establish the premarital and date of separation values for the apartment complex and his interest in the farming and ranching operation. Jackie did not offer expert testimony to rebut Jim's valuations. Instead, Jackie primarily relied on Jim's financial statements and her opinion to value the marital estate. Following presentation of the testimony and evidence, the District Court entered its Findings of Fact, Conclusions of Law, and Decree of Dissolution.

4

¶15  The District Court adopted Jackie's valuations for virtually every asset within the premarital and marital estate. In calculating the estates, the District Court reduced Jim's net worth by approximately $148,000 because of debts he owed to his family. Jackie objected, although unsuccessfully, to the inclusion of the family debt because Jim allegedly failed to disclose the information prior to trial. Although its decision is not completely clear, the District Court purported to award assets to Jim worth $582,561.86. The District Court awarded Jackie assets worth $230,581.14. Jackie's award consists primarily of cash payments in the amount of $157,964.41 (2/3 of the increase in Jim's net worth from the time of marriage to separation) and $51,261.73 (the value of the inheritance from Jackie's aunt). Further, the District Court awarded Jackie her reasonable attorney fees incurred in the dissolution proceedings.

¶16  Jim appeals the District Court's property distribution and attorney fee award. Jackie cross-appeals the District Court's consideration of the premarital debt in computing Jim's net worth.

## STANDARD OF REVIEW

¶17  We review a district court's findings of fact regarding the division of marital property to determine whether they are clearly erroneous. *In re Marriage of Ortiz* (1997), 282 Mont. 500, 503, 938 P.2d 1308, 1310. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Kovarik v. Kovarik*, 1998 MT 33, ¶ 20, 287 Mont. 350, ¶ 20, 954 P.2d 1147, ¶ 20. If the findings are not clearly

erroneous, we will affirm the distribution of property unless the district court abused its discretion. *In re Marriage of Stufft* (1996), 276 Mont. 454, 459, 916 P.2d 767, 770.

¶18 Further, we will not overturn a district court's award of attorney fees absent an abuse of discretion. *Harper v. Harper*, 1999 MT 321, ¶ 47, 297 Mont. 290, ¶ 47, 994 P.2d 1, ¶ 47. The test for an abuse of discretion is whether the trial judge acted arbitrarily without employment of conscientious judgment or has exceeded the bounds of reason resulting in substantial injustice. *Schmieding v. Schmieding*, 2000 MT 237, ¶ 22, 301 Mont. 336, ¶ 22, 9 P.3d 52, ¶ 22.

## DISCUSSION

## ISSUE 1

¶19 Did the District Court err in its valuation of the premarital and marital assets?

¶20 In its Findings of Fact, Conclusions of Law, and Decree of Dissolution, the District Court found "that the value of [Jim's] assets at the time of marriage was $266,885.73 and at the time of separation it was $555,052.24 . . . ."[1] The District Court ordered Jim to pay Jackie $51,261.73–the value of an inheritance she received during the marriage. Therefore, the District Court reduced Jim's date of separation value for his premarital assets by this amount and calculated the increase in Jim's net worth during the marriage at $236,934.78

---

[1] On appeal, Jim notes an apparent inconsistency in the value of the estate he is to receive pursuant to the District Court's property distribution. After repeated efforts we cannot reconcile the variations in the District Court's Findings of Fact 11 and 12 as to Jim's purported "net estate." However, it is not critical that we square the inconsistency on appeal and will therefore leave this task to the District Court on remand.

6

($503,790.51 - $266,855.73).[2] The District Court then awarded approximately two-thirds of this increase to Jackie in the form of a $157,964.41 cash award.

¶21 Jim contends that the District Court erroneously valued Jim's interest in the 5 S Partnership, the apartment complex, and the parties' 1997 Subaru Outback. Jim claims that these incorrect valuations skewed each respective parties' allocation of the marital estate and, ultimately, altered the calculation of Jackie's cash award to his detriment.

¶22 At trial, Jim offered expert testimony from Roger Cymbaluk, a licensed realtor and appraiser with extensive real estate experience in eastern Montana, to establish the necessary real property values. Using comparable sales information, Cymbaluk estimated the date of separation value for Jim's interest in the 5 S Partnership at $101,572.80 and the apartment complex at $72,500. Jackie did not offer expert testimony regarding the valuation of the real property at issue. Instead, Jackie submitted an "Agricultural Financial Statement" which Jim filled out and submitted to the farming and ranching operation's bank (First Bank). On this annual financial statement, Jim itemized his assets and liabilities and approximated the value of each. In the 1999 financial statement, Jim estimated that the date of separation values for his interest in the 5 S Partnership and the apartment complex were $284,128 and $70,000 respectively. The financial statement estimated the value of the Subaru Outback at $15,900.

---

[2] We have been unable to determine why the District Court subtracted $266,855.73 from Jim's date of separation estate as opposed to the $266,885.73 figure quoted earlier in the same findings of fact.

¶23    Jackie relied exclusively on the 1999 financial statement for the 5 S Partnership date of separation value. However, Jackie disagreed with the apartment complex estimate contained in the financial statement and Cymbaluk's appraisal. Instead, Jackie testified that, in her opinion, the apartment was worth between $103,000 and $110,000 at the date of separation. Finally, Jackie disagreed with Jim's valuation of the Subaru Outback and offered several lower assessments during her testimony, including an $11,000 estimate.

¶24    The District Court awarded the interest in the 5 S Partnership and the apartment complex to Jim and arguably awarded possession of the parties' Subaru Outback to both Jim and Jackie. For purposes of computing the net worth of the distributions, the District Court found "that the bank financial statements provide the most reliable source of valuation of the assets of the parties." Therefore, the District Court valued the 5 S Partnership interest at $284,128. However, the District Court strayed from the financial statement when it valued the apartment complex and Subaru Outback and essentially adopted Jackie's values for the two assets (except that the court placed two different values on the Subaru). The District Court valued the apartment complex at $110,000 and the Subaru Outback at $11,000. The District Court also awarded "Machinery, vehicles, and equipment" to Jim, valued at $42,100, pursuant to the financial statement. However, this award consisted of a Ford pickup (valued at $25,600), a Honda Prelude (valued at $600), and the Subaru Outback (valued at $15,900). Therefore, the District Court's distribution accounted for the Subaru Outback twice, at different values.

¶25    When asked at trial about the financial statement, Jim testified as follows:

8

Q: Okay. Now, when you issued this bank statement on December 15th of 1999, did you do a detailed inspection or calculation, if you will, of what all of the 5 S Partnership was worth?

A: No.

Q: And when you prepared this financial statement, did you do a detailed calculation of what the VS, Inc., property was worth and debts?

A: No.

Q: In connection with 5 S, before you prepared this financial statement did you have the property appraised by Mr. Cymbaluk or anybody else before you signed that financial statement?

A: No.

Q: Why not?

A: This is just a general year-to-year thing we do. The bank asks for them because we have loans with them, and it wasn't a very detailed thing. It was just kind of general.

During trial, the District Court expressed reservations about the reliability of financial statements filled out by borrowers, contrary to its ultimate reliance on the statement. The District Court and First Bank's President engaged in the following colloquy:

Court: And aren't borrowers supposed to lie about how much stuff is worth to their banker anyway to make it look better? Isn't that kind of the standard?

President: That has happened.

Court: That has happened.

President: That has happened many times.

Further, the First Bank President testified as follows:

9

Q: Do you rely on your debtors to be accurate when they turn in the financial statements to you?

. . . .

A: It's a practice of our bank to have the loan officer analyze the financial statement. And as the judge and I were just talking, yes, there's many times that we don't feel the machinery is worth what they say it's worth or the land what they say it's worth . . . .

Nevertheless, the District Court adopted the value found in the financial statement for the 5 S Partnership interest in contravention of the only expert testimony on the issue.

¶26     As to the apartment complex, Jackie admitted that she did not "know anything about real estate." However, upon questioning from her attorney, Jackie estimated the value of the apartment complex at between $103,000 and $110,000. Jackie justified this estimate based on the apartment complex's unique characteristics which distinguished it from the other properties in Sidney. Jackie offered no comparable sales information or any other evidence, in addition to her opinion, to justify her estimate. Yet, despite Jackie's admission that she knew nothing about real estate and the District Court's finding that the financial statement provided "the most reliable source of valuation of the assets of the parties," the District Court disregarded the expert appraisal and the financial statement estimation in favor of Jackie's valuation for the apartment complex.

¶27     Finally, the District Court appears to have awarded the Subaru Outback to both parties at different values. The District Court awarded the Subaru Outback to Jackie and valued it at $11,000, presumably based on the following testimony from Jackie:

Q: What do you think the value of the 1997 Subaru was in December of 1999?

10

A: I – I really don't know. I would say maybe between $13,000 and $14,000. Maybe $11,000. I – I don't know. I – I have no idea.

However, in the same finding of fact, the District Court awarded Jim "Machinery, vehicles, and equipment," as indicated in the financial statement, which included the Subaru Outback at a value of $15,900. On appeal, Jackie concedes that the District Court erroneously accounted for the Subaru Outback twice.

¶28 In sum, the District Court expressed concern for the values contained in the financial statement at trial but then concluded after the trial that the "financial statements provide the most reliable source of valuation of the assets of the parties." Consistent with this conclusion, the District Court valued the 5 S Partnership in accordance with the financial statement despite the significantly lower appraisal offered by Cymbaluk. However, the District Court disregarded Cymbaluk's appraisal and the financial statement when it valued the apartment complex based on Jackie's admittedly unsupported estimation. Finally, in awarding the value of the Subaru Outback to both parties at different values, the District Court impliedly found the financial statement credible and unreliable at the same time. Based on the foregoing, we conclude that the District Court's valuations set forth above are not supported by substantial evidence.

## ISSUE 2

¶29 Did the District Court err when it valued Jackie's financial contribution to the marital estate?

11

¶30 The District Court made the following finding regarding Jackie's financial contribution to the marital estate:

> Shortly after the marriage, [Jackie] received $51,261.73 in the form of an inheritance from her aunt. . . .
>
> At the time of the marriage, [Jackie] held $12,615.73 with Edward Jones, owned her IRA in the amount of $1,100.00, had a vehicle worth $5,000.00, and received monthly maintenance in the amount of $1,000.00 per month. She continued to receive the maintenance for 22 months during her second marriage to [Jim] totaling $22,000.00. [Jackie's] monetary contributions toward the marriage were approximately $91,977.00.

This $91,977 marital contribution figure is significant because the District Court considered Jackie's percentage of contribution to the marital estate when it determined what percentage of the marital estate to award to Jackie.

¶31 Jim contends that the maintenance award from Jackie's prior marriage was not an asset but should simply be treated as income. Jim contends that the District Court did not credit him for post-separation maintenance he paid to Jackie or income he earned during the marriage. Therefore, Jim maintains that the District Court should not have considered the maintenance when it computed Jackie's financial contribution to the marital estate.

¶32 In *In re Marriage of Eklund* (1989), 236 Mont. 77, 79, 768 P.2d 340, 342, we held that a portion of the marital estate may be set aside if it is traceable to one party or the other. Whether it is traceable depends on the adequacy of the evidence presented in the case. Here, the evidence at trial indicated that the parties treated the maintenance as joint income and, in fact, reported it as such on the parties' joint income tax returns for 1994 and 1995. Further, when asked what she did with the maintenance income during her marriage to Jim,

12

Jackie testified that "it went into just joint accounts." The record includes no evidence which indicates that Jackie intended to segregate the $22,000 from the marital estate.

¶33 As Jackie made no effort to separate this income from the marital estate and, instead, commingled the money with the joint funds, as was done with Jim's income, we conclude that the District Court erred when it characterized the $22,000 as a premarital asset contributed to the marital estate. The evidence in the record indicates that Jackie's premarital estate was worth approximately $18,715.73. The District Court's finding to the contrary was not supported by substantial evidence and is clearly erroneous.

## ISSUE 3

¶34 Did the District Court err when it required Jim to reimburse Jackie for the entire amount of her inheritance?

¶35 The District Court made the following finding regarding Jackie's inheritance:

> Shortly after the marriage, [Jackie] received $51,261.73 in the form of an inheritance from her aunt. This money was wired to First Bank in Sidney, Montana. The money was first used to pay off [Jim's] debt against the apartment building, then partly to purchase bank stock in First Bank and finally, was [sic] the remainder was placed into the joint savings of the parties, which was removed by [Jim] at the time of separation.
>
> . . . .
>
> Each party should receive their own inherited property. Thus, the court should award to [Jim] his stock in Steinbeisser & Sons, Inc. Further, the court should award to [Jackie] the sum of $51,261.73, representing her inheritance from her aunt . . . [plus] interest on her inheritance since [Jim] has had the use of the money since September, 1994 . . . .

13

Pursuant to these findings, the District Court ordered Jim to pay Jackie $51,261.73 as compensation for the dissipated inheritance.

¶36 Jim contends that the District Court erred when it awarded Jackie the entire amount of her inheritance. Jim maintains that Jackie is entitled to some of the inheritance, but only that portion which she can trace to ascertainable assets. On appeal, Jim concedes that Jackie applied $12,749.82 of her inheritance to the mortgage on the apartment complex. Further, Jim's proposed findings of fact and conclusions of law acknowledged that Jackie used $16,250.00 of her inheritance to purchase stock in First Bank. However, Jim insists that Jackie deposited the remainder of her inheritance, approximately $22,000.00, in the parties' joint savings account. Therefore, as to her inheritance, Jim contends that Jackie is entitled to $28,999.82, not the entire $51,261.73.

¶37 Those assets belonging to a spouse prior to a marriage, or acquired by gift, bequest, devise, or descent during the marriage are not part of the marital estate unless the spouse made contributions in the preservation or appreciation of that property. *In re Marriage of Rolf*, 2000 MT 361, ¶ 46, 303 Mont. 349, ¶ 46, 16 P.3d 345, ¶ 46. Where an inheritance is not traceable and both parties contribute to the increased value, it is inequitable to award the value of the asset solely to the acquiring spouse upon dissolution. *See In re Marriage of Anderson* (1986), 220 Mont. 477, 483, 717 P.2d 11, 15; *In re Marriage of Herron* (1980), 186 Mont. 396, 404, 608 P.2d 97, 101.

14

¶38 After a discussion about the application of the inheritance money to the apartment complex's mortgage, Jim testified to the following under cross examination by Jackie's attorney:

> Q. Okay. And what was done with the balance of the 51,000 then?
>
> A. We had – We opened a CD, and then in the course of time we closed that CD. That CD included her inheritance money plus some other money, I believe. Maybe not. Maybe it was just hers. I don't remember for sure, but we closed that then and we combined – we took the remainder – We put some money in a savings account, a special high-interest savings account, with some other money that I had prior, and then some went to buy the stock, the additional bank stock.
>
> Q. And at the time of your separation in December of 1999, other than the money that was used on the bank's stock, was the balance of Jackie's inheritance, did it remain in those First Bank accounts?
>
> A. In a savings account, yes.
>
> Q. And was that the money that you withdrew at the time of separation?
>
> A. It was in that account. There was additional money in that account.
>
> Q. It was commingled ----
>
> A. Yes.

At trial, Jackie agreed that the balance was deposited in the parties' joint savings account. As its name implies, the account was opened in both parties' names and both parties maintained access to it. The evidence indicates that both parties contributed to the account and utilized the account for joint expenditures.

¶39 As the balance of Jackie's inheritance was commingled with other marital funds in the joint savings account, it is therefore not traceable. Since the $22,000 inheritance balance

15

is not traceable and Jim contributed to the savings account, we hold that the District Court erred when it awarded Jackie the entire amount of her inheritance.

## ISSUE 4

¶40 Did the District Court err when it found that Jackie gave up her teaching career for the marriage?

¶41 Jim contends that Jackie received a disproportionate share of the marital estate, in part, because the District Court concluded that Jackie abandoned her teaching career for the marriage. Jim submits that Jackie never maintained a teaching "career." Further, Jim insists that the marriage never prohibited any prospective teaching pursuits Jackie may have entertained during or after the marriage.

¶42 The District Court found that Jackie's "marriage resulted in her not continuing teaching, and thus giving up its related retirement benefits." Aside from this one reference, the District Court made no mention of what impact the marriage had on Jackie's marital or future employment as a teacher. Further, the District Court did not elaborate on how this finding affected its property distribution.

¶43 At trial, Jackie testified that: she received a Bachelor of Science degree in education in 1965; however, she did not pursue work in education following graduation from college and, therefore, her teaching certification expired; following her first divorce in the mid 1980s, she substitute taught while she worked toward recertification; she taught full time during the 1992-93 school year; the full time teaching experience was "extremely difficult;" she has not taught since 1993 and, therefore, her certification has since expired; and she has

16

no intention of returning to teaching. We conclude that the evidence simply does not support a finding that Jackie abandoned a teaching career for the marriage. Therefore, on remand the District Court's distribution of the marital estate should not be based on that finding.

## ISSUE 5

¶44 Did the District Court err when it awarded Jackie two-thirds of the appreciated value of Jim's pre-acquired property?

¶45 The District Court entered the following findings in regard to the distribution of Jim's premarital property:

> During the marriage both parties contributed to the maintenance of the assets of the marriage. [Jackie] worked on the farm and was active in agricultural issues, with the encouragement of [Jim], through the Montana Farm Bureau. [Jackie] was also active on the farm, performing the usual farm wife tasks of cooking, cleaning, maintenance of the yard, assistance with calving and in feeding bum calves, assistance in riding horses or herding cattle, assistance in fencing and other duties as needed and required. During the marriage, [Jackie] was primarily responsible for management of the apartment complex owned by the parties, including interviewing tenants, collecting rents, paying bills, arranging for maintenance to be done, etc. . . . [Jackie] further contributed financially to the marital estate through use of her inheritance to purchase bank stock, to pay off debts, and to contribute to savings. Further, her maintenance income received from her first husband was deposited to the joint accounts of the parties.
>
> . . . .
>
> [T]he court finds that the value of [Jim's] assets at the time of marriage was $266,885.73 and at the time of separation it was $555,052.24, exclusive of his inherited Steinbeisser and Son's stock.
>
> . . . .
>
> Reducing the net worth of [Jim] by . . . [Jackie's inheritance] leaves [Jim] with a net worth of $503,790.51 . . . . The increase in his net worth

17

during the marriage after reducing the marital estate by said award is ($503,790.51 - $266,855.73) $236,934.78. Said amount should be divided 1/3 to [Jim] and 2/3 to [Jackie] requiring an award of $157,964.41 to [Jackie] in addition to restoration of her inherited property.

¶46 Jim does not dispute Jackie's entitlement to a share of the marital estate. However, Jim does challenge the District Court's award to Jackie of two-thirds of the value of the appreciation in his premarital assets. Jim contends that this cash award bears no relationship to Jackie's actual contributions to the preservation or appreciation of those assets.

¶47 Section 40-4-202, MCA, controls the division of pre-acquired property in a proceeding for dissolution, and provides in pertinent part:

(1) [T]he court . . . shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both. . . . In dividing property acquired prior to the marriage; . . . the increased value of property acquired prior to the marriage; . . . the court shall consider those contributions of the other spouse to the marriage, including:

(a) the nonmonetary contribution of a homemaker;

(b) the extent to which such contributions have facilitated the maintenance of this property; and

(c) whether or not the property division serves as an alternative to maintenance arrangements. [Emphasis added.]

This section provides for equitable distribution of pre-acquired property, taking into consideration the contributions of the non-acquiring spouse to its preservation or appreciation. *Stoneman v. Drollinger*, 2000 MT 274, ¶ 18, 302 Mont. 107, ¶ 18, 14 P.3d 12, ¶ 18. The non-acquiring spouse is entitled to an equitable share of only the appreciated or preserved value which is attributable to his or her efforts. *Rolf*, ¶ 46. A court cannot

18

distribute to the non-acquiring spouse property acquired prior to the marriage when there is no evidence that the spouse made any contribution to those assets in any form. *In re Marriage of Smith* (1994), 264 Mont. 306, 312, 871 P.2d 884, 888. Absent a showing of contribution, being the family homemaker does not alone entitle one to the appreciation in property. *Stoneman*, ¶ 20. Finally, a non-acquiring spouse is not entitled to a share of the increase in premarital property when the property's appreciation is due simply to market factors. *In re Marriage of Hogstad* (1996), 275 Mont. 489, 499, 914 P.2d 584, 590 *superseded on other grounds as stated in In re Marriage of Martinich-Buhl*, 2002 MT 224, 311 Mont. 375, 56 P.3d 317.

¶48 We have had a difficult time determining how the District Court computed Jim's net worth at $503,790.51 in finding of fact number 11, given the fact that the District Court itemized Jim's assets in finding of fact number 12 and calculated an entirely different net worth for Jim. Nevertheless, the bulk of Jim's premarital assets appear to include two accounts with Edward Jones, an IRA, a Certificate of Deposit, a life insurance policy, seventy shares of First Bank stock, three horses, the apartment complex, and Jim's interest in the 5 S Partnership and VS, Inc.

¶49 At trial, Jim testified that Jackie had no involvement with his Edward Jones accounts following their marriage. Jackie conceded that the parties made no financial contributions to those accounts during the marriage. Jim testified that he did own an IRA prior to the marriage and that the parties invested money in that account during the marriage. Jim purchased his Certificate of Deposit in 1989, prior to the marriage, and testified that the

parties did not add to its value during the marriage. Prior to the marriage, Jim purchased a life insurance policy through the Western Farm Bureau Life Insurance Company. Jim testified that the parties used marital income to pay the policy's premiums throughout the marriage. Prior to the marriage, Jim purchased seventy shares of First Bank stock. Although Jim amended the stock certificate to add Jackie's name, Jim testified that Jackie did nothing to contribute to the stock's appreciation. Jim owned three horses prior to the marriage and there is evidence in the record that Jackie helped care for the horses during the marriage.

¶50 Jim testified that Jackie performed the majority of the work necessary to operate the apartment complex. However, the parties offered conflicting testimony regarding Jackie's contribution to the farming and ranching operation. Jackie maintained that she performed all of the duties required of a homemaker and helped with the tasks outlined in the District Court's findings of fact which are set forth above. Further, Jackie contends that she contributed financial support to the operation in the form of her maintenance checks from the prior marriage and her inheritance.

¶51 Jim acknowledged that Jackie contributed to the farm's operation during the initial years of their marriage. However, Jim testified that "[t]owards the end of the marriage, the last two, three years, her involvement decreased substantially, and the last couple years she was gone a lot and was not very involved." In his proposed findings of fact and conclusions of law, Jim agreed that Jackie's efforts did contribute to the increase in value of Jim's interest in VS, Inc. However, Jim insists that Jackie's efforts did nothing to contribute to the

20

appreciation in his interest in the 5 S Partnership, which owned the farm and ranch real estate.

¶52 The District Court did not value Jim's premarital interest in the 5 S Partnership. However, Cymbaluk valued this asset at $119,091.50 at the time the parties married. If we use Cymbaluk's 1994 value and the District Court's 1999 value for Jim's interest in the 5 S Partnership, it appears that this asset had appreciated by the approximate amount of $165,000 after only five years and ten months of marriage. We understand that as the finder of fact it was certainly within the District Court's discretion to weigh the conflicting testimony, ascertain the credibility of the witnesses, and resolve factual conflicts. However, the District Court awarded Jackie two-thirds of this appreciation without any consideration for or recognition of the fact that it was largely based on appreciating property values and other similar market factors.

¶53 We note that the District Court justified its cash award to Jackie, in part, as an alternative to maintenance. However, the District Court also concluded that only "1/6 of the . . . [property division] would be in lieu of maintenance." Consequently, we presume the other 5/6 of Jackie's award reflects her contributions to the assets. As indicated above, the evidence at trial established that Jackie made no contribution to some of Jim's premarital assets and minimal to substantial contribution, monetarily and otherwise, to others. Yet, the District Court simply computed the value of Jim's premarital property before the marriage and at the separation and, in summary fashion, awarded Jackie two-thirds of the appreciation.

21

¶54 Jackie may in fact be entitled to some of this appreciation based on her contributions to the assets. However, the District Court must evaluate Jackie's contribution to each of the premarital assets and allocate her award accordingly. The District Court cannot simply tabulate the appreciation in Jim's premarital assets and award Jackie two-thirds of its value without regard to her respective contribution to each and, therefore, we conclude that the District Court erred when it did so.

## ISSUE 6

¶55 Did the District Court err when it awarded attorney fees to Jackie?

¶56 The District Court awarded Jackie her reasonable attorney fees based on the following:

> [Jackie] has incurred substantial attorneys fees due to delay in discovery, filing of motions to compel discovery and in motions for contempt due to late payments of maintenance and due to [Jim's] changing of beneficiaries on his life insurance in violation of the restraining order issued herein. It was clear at the trial of this matter that [Jackie] had not been afforded complete discovery. The court has allowed introduction of the evidence not provided to [Jackie], but finds that [Jackie] is entitled to attorneys fees as the claims of lack of compliance with discovery were merited. All documents offered by [Jackie] (although objected to by [Jim] due to alleged failure to produce) were documents which remained at all times during these proceedings in the control of [Jim] and available to him and his counsel. The court will set a post-trial hearing, if necessary, for a determination of the amount of attorneys fees due by [Jim] to [Jackie].

The District Court cited no authority as justification for its attorney fee award.

¶57 Prior to trial, Jackie served Jim with interrogatories and requests for production pursuant to the Montana Rules of Civil Procedure. At trial, Jackie expressed dissatisfaction with Jim's responses to her discovery requests. On appeal, Jackie states, "The District Court

22

was aware of this abuse of the discovery process and thus, had the right to find as it did that [Jim] significantly increased the costs of litigation incurred by [Jackie] and therefore, [Jackie] was entitled to an award of attorney fees." The District Court's findings of fact and Jackie's allegations appear to be based on rules related to discovery. However, the District Court's findings of fact and conclusions of law do not identify the procedural or statutory basis for its award. On appeal, Jackie contends that the attorney fee award was warranted pursuant to §§ 40-4-110 and -255, MCA. Therefore, we will not examine the attorney fee award within the context of the discovery rules. Instead we analyze it pursuant to §§ 40-4-110 and -255, MCA.

¶58 Section 40-4-110, MCA, provides in relevant part:

> (1) The court from time to time, after considering the financial resources of both parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under chapters 1 and 4 and for professional fees, including sums for legal and professional services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment.

An award of attorney fees pursuant to § 40-4-110, MCA, is appropriate if it is: (1) based on necessity; (2) reasonable; and (3) based on competent evidence. *Schmieding*, ¶ 25. A finding of necessity must be supported by factual findings. *Pfeifer v. Pfeifer* (1997), 282 Mont. 461, 466, 938 P.2d 684, 688. Facts that we have traditionally considered in determining necessity are: (1) the requesting party's inability to pay her own attorney fees; (2) the other party's ability to pay attorney fees; and (3) the relative financial positions of the parties. *Schmieding*, ¶ 26.

23

¶59 The District Court entered findings regarding the relative financial positions of the parties and the prospect of future earnings. However, to justify an attorney fee award pursuant to § 40-4-110, MCA, Jackie first had to demonstrate an inability to pay her own attorney fees. When it divided the premarital and marital property, the District Court ordered that Jim pay Jackie $209,226.14. The District Court's findings do not address Jackie's ability to pay her own attorney fees and Jackie has not cited any evidence to that effect on appeal. Furthermore, we are not able to make that determination on appeal because we have reversed the District Court's valuation and distribution of the marital estate. A determination of Jackie's entitlement to an award of attorney fees pursuant to § 40-4-110, MCA, will necessarily have to be determined based on the criteria set forth above following remand to the District Court.

¶60 Section 40-4-255, MCA, provides in pertinent part:

> (3) If a party fails to comply with any provision of 40-4-251 through 40-4-258, the court shall, in addition to any other remedy provided by law, order the noncomplying party to pay to the complying party any reasonable attorney fees or costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

Jackie claims the award of attorney fees was justified pursuant to § 40-4-255, MCA, because Jim failed "to comply with the declarations of disclosure required by statute." Jackie does not expand on which declaration of disclosure provision Jim failed to comply with.

¶61 As indicated above, § 40-4-255, MCA, authorizes a court to award attorney fees when a party fails to comply with any provision contained in §§ 40-4-251 through -258, MCA.

24

The record shows that Jim executed a preliminary declaration of disclosure, pursuant to § 40-4-252, MCA, and served Jackie with the same. Neither party filed a final declaration of disclosure pursuant to § 40-4-253, MCA, and, therefore, Jackie does not appear to be a "complying" party who may seek an award pursuant to this section.

¶62 For these reasons, the attorney fee award to Jackie is set aside subject to reconsideration by the District Court following revaluation and distribution of the marital estate.

## ISSUE 7

¶63 Did the District Court err when it reduced the divisible marital estate on account of premarital debt that Jim purportedly failed to disclose prior to trial?

¶64 At trial, Jim submitted evidence which documented large sums of money that he owed to his family and the District Court subsequently found that the marital estate "should be reduced by 'family' debts . . . ." Jackie contends that Jim did not disclose these liabilities in his preliminary declaration of disclosure, in responses to Jackie's discovery requests, or in a final declaration of disclosure. Jackie claims that if she had this information prior to trial she could have:

> 1) undertaken further investigation to determine the authenticity of the obligations, 2) could have deposed the various providers of the funds, 3) could have demonstrated the obligations were not expected to be repaid and 4) could have more adequately assessed her position prior to trial and perhaps resolved the matter without trial.

Since she could not "prepare a defense to those liabilities," Jackie maintains that she was precluded from recovering two-thirds of the value of the reduction in the marital estate.

25

¶65 Jim agrees with Jackie that the District Court "erred in its Findings regarding these family obligations," however, for a different reason. Jim contends that the value adopted by the District Court for his premarital assets was reduced to account for his premarital debt. However, Jim asserts that the date of separation value adopted by the District Court did not account for the premarital debt. Therefore, Jim maintains that the District Court substantially discounted the value of Jim's premarital estate and inflated the value of his assets as of the date of separation and, therefore, erroneously calculated the appreciation.

¶66 Clearly, Jim's preliminary declaration of disclosure did not reference the family debt. Further, Jim did not supplement his preliminary disclosure despite his "duty to update and augment material changes to that disclosure [to preclude] the need of formal discovery," pursuant to the preamble to the disclosure laws found at §§ 40-4-251 through -258, MCA. Finally, Jim admits that he did not file a final declaration of disclosure, pursuant to § 40-4-253, MCA. However, neither did Jackie file a final declaration of disclosure. Therefore, as previously noted, she cannot rely on § 40-4-255, MCA, for exclusion of Jim's non-disclosed debts.

¶67 Jackie did serve Jim with formal discovery requests, pursuant to the Montana Rules of Civil Procedure, which requested an itemized list of all of Jim's liabilities. Jim contends that he supplied this information to Jackie and Jackie disputes ever receiving it. Based on the record before us, we cannot substantiate what documents and corresponding information were available to Jackie prior to trial. Furthermore, Jackie did not object to the admission

of this evidence when offered at trial. Therefore, we conclude that the District Court did not err when it considered the evidence of premarital debt.

¶68 However, Jim contends that the District Court's inconsistent treatment of the premarital debt warrants reconsideration on remand. Frankly, we cannot discern the cause of the discrepancy in Jim's net worth between findings of fact numbered 11 and 12. Perhaps the explanation for the inconsistency lies somewhere in the District Court's treatment of the premarital debt as Jim suggests. However, the District Court's findings offer no insight to credit or discredit Jim's speculation regarding the contradictory values. Based on our conclusions to the previous issues, the District Court is going to have to revalue the parties' premarital and marital estates and redistribute the marital estate. Premarital debt is one factor to consider in that revaluation and Jackie should not be precluded from the discovery she deems necessary to challenge the amount of Jim's family debt.

¶69 Based on the foregoing, we reverse and remand this case to the District Court for revaluation and distribution of the parties' premarital and marital assets in accordance with this Opinion.

_____
Justice

We Concur:

_____

27

_W. William Leyhart_

_Patricia Cotter_
Justices

28