No. 97-308

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 33


IN RE THE MARRIAGE OF
CURTIS ALAN KOVARIK,

Petitioner / Respondent,

v.

SANDEE RAE KOVARIK,

Respondent / Appellant.


APPEAL FROM:   District Court of the Twentieth Judicial District,
In and for the County of Lake,
The Honorable C. B. McNeil, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

David C. Humphrey, Humphrey Law Office, Polson, Montana

For Respondent:

Keith W. McCurdy, McCurdy Law Firm, Polson, Montana


Submitted on Briefs: October 2, 1997

Decided:   February 18, 1998
Filed:


_____
Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1    The marriage of Sandee Rae Kovarik (Sandee) and Curtis Alan Kovarik (Curtis) was dissolved pursuant to the Findings of Fact, Conclusions of Law, and amended Decree of Dissolution entered by the Twentieth Judicial District Court, Lake County.  Sandee appeals the court's decision regarding division of marital property, custody, child support, and maintenance.  We affirm in part, reverse in part, and remand for further findings consistent with this opinion.

¶2    The issues on appeal are as follows:

¶3    1.  Did the District Court err in valuing and dividing the marital property?

¶4    2.  Did the District Court err in designating Curtis residential custodian of the parties' two youngest children?

¶5    3.  Did the District Court err in its award of child support?

¶6    4.  Did the District Court err in declining to award Sandee rehabilitative maintenance?

BACKGROUND

¶7    Sandee and Curtis were married in North Dakota in 1970.  Together, they have seven children: M.K., K.K., J.K., and C.K., all adult children; A.K., a teenager; and R.K. and T.K., ages eleven and seven respectively.  The parties' first residence consisted of a lot with a trailer home.  When the family later became too big for the trailer home, the parties purchased and moved into a house on a nearby lot.  Currently, the parties own both residences.  In addition to these residences, the parties own a car, a two-ton truck and trailer, several pick-ups, a camper, numerous tools and items of equipment used in the family business, accounts receivable from the business, as well as personal and home effects.  In addition to the debt incurred on some of the above items, the parties have consumer debt.

¶8    Curtis and Sandee both have high school educations.  Throughout their marriage, Sandee was the primary homemaker and Curtis was the primary financial provider.  For the last eighteen years, Curtis has owned and operated a drilling and blasting business known as Curt's Compressor Service.  During this time, Sandee performed some odd jobs outside of the home.  Until Angela was born, fifteen years ago, Sandee was employed as an Avon representative.  Later, Sandee experimented for a short time with her own cheesecake business, selling cheesecakes out of her home.

¶9   During the last two to three years of marriage, Sandee assisted with the bookkeeping of the family business.  To better qualify herself for this task, Sandee completed computer and accounting classes at a nearby community college.  Sandee and Curtis also discussed the possibility of Sandee driving the trucks and taking on a more active role in the physical labor of the business.  To this end, Sandee completed a truck-driving course at the community college.  Although Sandee obtained her commercial driver's license, she has not yet put it to use.  When Sandee first attempted to drive the family business trucks, she caused some damage to one of the trucks.  Thereafter, Curtis decided not to have Sandee drive the trucks.

¶10  The marriage of Curtis and Sandee deteriorated over the years, and culminated in petitions for dissolution in July, 1996.  On August 29, 1996, Curtis filed a motion for citation and order to show cause why he should not be granted temporary custody of the two youngest children, R.K. and T.K..  Curtis also sought a temporary restraining order against his wife and exclusive control over the house during the pendency of the proceedings.

¶11  On September 18 and 19, 1996, the court conducted a hearing on the matter.  Each of the five oldest children gave testimony describing the abusive nature of Sandee.  Three children testified that the verbal and physical abuse of their mother caused them to "run away" or move out.  The eldest daughter testified that as each child moved out, it appeared Sandee would turn her aggressions on to the next child "down the line."  This daughter also expressed her fear that if the two youngest children continued in the care of their mother, they too would have to endure the abuse.  The eldest son recalled an incident where Sandee yelled at and hit Curtis, and then kicked the eldest son when he told her to stop.  Another daughter testified that Sandee hit her on the ear with the phone for speaking with her sister.  Another son testified that his mother hit him and that she "kicked him out" of the house.

¶12  In her defense, Sandee put on witness testimony from school personnel that she was an involved parent, attentive to the needs of her children.  A child development specialist testified that Sandee had consulted her about the special needs of C.K. and T.K.,

and that Sandee had joined a support group for parents of children experiencing Attention Deficit Disorder. R.K., a minor child, testified on behalf of her mother and stated that C.K. would "egg" his mother on, call her names, and provoke fights. However, Curtis stated that C.K. did this because he did not like Sandee's current lover, Brennan Jones (Jones).

¶13 The admitted love affair between Sandee and Jones was a point of contention regarding the best interests of the children. Jones was K.K.'s husband and Sandee's son-in-law. He is a convicted felon currently on probation for felony theft and aggravated assault. One skirmish between K.K. and Jones resulted in a gunshot wound in K.K.'s leg. Although K.K. has since divorced Jones, Curtis stated his belief that the relationship between Sandee and Jones was ongoing, as he had seen them together several times. Curtis believed Jones to be prone to violence and did not want the minor children to have any contact with him.

¶14 On September 19, 1996, based on the testimony elicited in the two hearings, the court granted Curtis temporary custody of the minor children during the pendency of the dissolution proceedings. The court also granted Curtis exclusive control of the home, ordered Sandee to vacate the home by September 30, 1996, and enjoined Sandee from entering the premises during the pendency of the proceedings. However, the court granted Sandee reasonable visitation as agreed by the parties, and awarded her temporary support at the rate of $300.00 per month during the pendency of the proceedings.

¶15 Shortly after the court issued its order, Sandee went to the family home to gather her personal items. She found some things missing, including some of her jewelry. Sandee testified that K.K. stole the jewelry. Sandee called Curtis' attorney and threatened to file a report if he did not recover and return the missing items to her. Curtis' attorney found the missing jewelry and returned it to Sandee. Sandee then moved out, rented an apartment, and obtained a $2400.00 loan to pay her rent and other expenses until she could find employment. Sandee soon found employment at a janitorial service and earned $5.50 per hour.

¶16 On November 1, 1996, Sandee moved the court to reconsider its prior order, and, based on alleged changed circumstances, requested that she be awarded custody of R.K. and

T.K., as well as child support and maintenance, during the pendency of the proceedings. Sandee also requested a partial distribution of assets. On November 13, 1996, the court heard more testimony on these matters and ultimately denied Sandee's motion. The court did not rule on the issue of partial distribution of assets because the parties had not yet submitted their proposals for division of marital property, custody, and maintenance.

¶17 Over the course of the next few months, the parties engaged in discovery, and submitted to the court separate proposals regarding division of the property, custody, and maintenance. The court appointed guardians ad litem for R.K. and T.K. On February 10 and 12, 1997, the court conducted its final hearing on the matter. The parties submitted evidence as the basis for the values they assigned to the items listed in the marital estate. The guardian ad litem for T.K. testified that in his opinion, T.K.'s best interests would be served if Sandee were his primary residential custodian. The guardian ad litem for R.K. testified that although in September R.K. expressed an interest to live with Sandee, R.K. had since changed her mind because she did not feel comfortable being around Jones. A.K., the parties' teenage daughter, told the court she preferred to live with Curtis.

¶18 On February 27 and 28, 1997, the parties each submitted to the court proposed findings and conclusions. On March 18, 1997, the court entered its Findings of Fact, Conclusions of Law, and Decree of Dissolution. Regarding division of property, the court awarded Curtis and Sandee equal portions of the net marital estate. Although Curtis received more tangible assets, the court assigned a larger share of debt to Curtis, and awarded Sandee supplemental cash in the amount of $19,631 to make up the difference. Regarding custody, the court awarded the parties joint custody, and designated Curtis the primary residential custodian. The court awarded liberal visitation with the minor children according to a set schedule. Further, the court ordered Sandee to pay $180.00 per month in child support. Regarding spousal maintenance, the court concluded that neither party was required to pay maintenance to the other.

¶19 On April 21, 1997, the court amended the original Findings of Fact, Conclusions of Law, and Decree to correct certain clerical and computational errors not relevant to

this appeal. Additional facts will be provided as necessary to dispose of the issues raised.

STANDARD OF REVIEW

¶20 In matters relating to the division of marital property, child custody, and maintenance, we review a district court's findings of fact to determine whether the findings are clearly erroneous. Rule 52(a), M.R.Civ.P.; In re Marriage of Pfeifer (1997), 282 Mont. 461, 467, 473, 938 P.2d 684, 688, 692 (standards for division of marital property and maintenance); In re Marriage of Huotari (1997), Mont. , 943 P.2d 1295, 1297, 54 St. Rep. 884 (standard for child custody). A finding is clearly erroneous only if it is not supported by substantial evidence, the trial court misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. In re Marriage of Stufft (1996), 276 Mont. 454, 459, 916 P.2d 767, 770. We have defined substantial evidence as "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Barrett v. Asarco Inc. (1990), 245 Mont. 196, 200, 799 P.2d 1078, 1080. In determining whether a finding of fact is clearly erroneous, "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52(a), M.R.Civ.P.

¶21 If the findings underlying a district court's division of property are not clearly erroneous, then the court's division is discretionary and is reviewed for an abuse of discretion. Stufft, 916 P.2d at 770. We review a district court's award of child support for abuse of discretion. Stufft, 916 P.2d at 770. In evaluating abuse of discretion, we look to whether "the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." In re Marriage of Wessel (1986), 220 Mont. 326, 333, 715 P.2d 45, 50 (citations omitted).

DISCUSSION

Issue 1

¶22 Did the District Court err in valuing and dividing the marital property?

¶23 Distribution of marital property is determined by the guidelines set forth in

40-4-202, MCA, which provides in part:

> In a proceeding for dissolution of a marriage . . . the court, without regard to marital misconduct, shall . . . finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired . . . .

In dividing the marital property between Curtis and Sandee, the District Court made the following findings:

> 21. That the Court determines an equitable division of the marital estate is to distribute property on Exhibit "A" to [Curtis] and the property on Exhibit "B" to [Sandee], and that the gross value of the marital estate as shown thereon is $414,397.00 and the net value is $202,282.00.

> 23. In order to equalize the division of the marital estate, the Court determines that an amount of $19,631.00 is to be paid by [Curtis] to [Sandee].

¶24 Items listed on Exhibit A distributed to Curtis totaled $329,887 and included: the parties' current residence valued at $130,000; two vehicles valued at approximately $32,000; a new Ingersoll Rand drill valued at $117,000; accounts receivable valued at $650.00; two bank accounts valued at $4057; and miscellaneous tools, equipment and household items valued at $46,180. The secured debt on assets distributed to Curtis amounted to $208,074. Curtis' net share of the marital estate was $101,141. The court assigned to Curtis other debt in the amount of $21,510.35.

¶25 Items listed on Exhibit B distributed to Sandee totaled $84,510 and included: the parties' old residence valued at $35,000; four vehicles valued at $26,900; a fifth wheel camper valued at $14,000; jewelry valued at $5000; and household items valued at $3610. The secured debt on assets distributed to Sandee amounted to $3000. With the court's cash award of $19,631 designed to equalize the distribution, Sandee's net share of the marital estate was $101,141, exactly equal to that of Curtis. The court assigned other debt to Sandee in the amount of $6401.

¶26 On appeal, Sandee assigns error to the following: (1) the court's inclusion of jewelry on her list of distributions; (2) the court's exclusion from marital debt the $2400 loan she incurred in moving out of the house and renting an apartment; (3) the court's valuation of Curtis' business and personal bank account; (4) the court's alleged exclusion of the

Ingersall
Rand jackhammer from its distribution of property; (5) the court's valuation of the two-ton
truck and trailer; (6) the court's failure to assign a value and distribute separately the hitch
used to pull the fifth wheel camper; (7) the court's failure to consider Curtis' $3611 payment
of attorney's fees out of the marital estate prior to distribution; (8) the court's failure to
consider $14,595 worth of expenditures made by Curtis prior to distribution; and (9) the
court's failure to adopt Sandee's proposed obligatory language designed to protect her
distributions from any future declaration of bankruptcy by Curtis.

¶27  None of these alleged errors, with the exception of number (5), is properly before this
Court.  We will not entertain issues or theories raised for the first time on appeal.  In re
Marriage of Binsfield (1995), 269 Mont. 336, 344, 888 P.2d 889, 894.   Under § 46-20-104(2), MCA, failure to make a proper objection at trial constitutes a waiver of the objection.
Additionally, Rule 103(a)(1), M.R.Evid., requires that objections be timely and specific.  The
underlying policy of these rules is the idea that a court cannot be placed in error for
something which it never had the opportunity to decide.

¶28  Our review of the record indicates that Sandee made only a blanket, overall objection
to Curtis' proposed division of property on the basis that the values he had assigned to the
items were subjective.  With the exception of error (5), Sandee failed to adequately present
to the trial court, by objection, testimony, argument, or otherwise, the other eight alleged
errors.  Therefore, we cannot now consider them on appeal.

¶29  We now turn to alleged error (5).  At trial, Sandee valued the 1983 International two-ton truck and custom trailer together at $15,000.  Sandee testified that the $15,000 value she
assigned to the truck and trailer was based on one of Curtis' prior loan applications in which
he listed the truck and trailer as collateral valued at $15,000.  However, Curtis testified that
the truck and trailer were worth $10,000; $8000 for the truck and $2000 for the custom
trailer.  The record reflects that Curtis' valuation of the truck and trailer was based on his
estimate of how useful the items actually were.  The court adopted Curtis' valuation of the
truck and trailer.

¶30  Sandee contends that the court erred in failing to adopt her valuation of the truck and
trailer.  In cases tried to the court without a jury, the credibility of witnesses and the weight
to be afforded their testimony is a matter left to the sound discretion of the district court.
Keebler v. Harding (1991), 247 Mont. 518, 523, 807 P.2d 1354, 1357.  In Wessel, we stated:

     This Court's function . . . is not to substitute its judgment in place of the trier
     of facts but rather it is "confined to determine whether there is substantial
credible evidence to support" the findings of fact . . . . Although conflicts may exist in the
evidence presented, it is the duty and function of the trial judge to resolve such conflicts.
Wessel, 715 P.2d at 50 (citations omitted).  Both Sandee and Curtis submitted evidence
concerning the value of the truck and trailer.  The court believed Curtis' evidence to be more
credible.  We conclude that the District Court's finding that the truck and trailer were worth
$10,000 was adequately supported by substantial evidence and, therefore, was not clearly
erroneous.  Further, we determine that based on the record, the court neither acted arbitrarily
nor exceeded the bounds of reason in valuing the truck and trailer.  Thus, we conclude that
the District Court did not abuse its discretion in valuing the truck and trailer at $10,000.

                          Issue 2

¶31  Did the District Court err in designating Curtis residential custodian of the
parties' two youngest children?

¶32  The District Court is to determine custody in accordance with the best interests of the
child, considering all relevant factors, pursuant to  40-4-212, MCA.  In determining custody
of the parties' two youngest children, R.K. and T.K., the District Court found that it was in
the children's best interests for Curtis and Sandee to share joint custody, with Curtis
designated the primary residential custodian.

¶33  Sandee argues that no substantial, credible evidence exists to support the court's
designation of Curtis as the primary custodian.  We disagree.  In Otto v. Otto (1990), 245
Mont. 271, 274-75, 800 P.2d 706, 708, we stated:

     As this Court has said many times, the trial judge in a divorce proceeding is in
     a better position than this Court to resolve child custody. * * * Despite

conflicting testimony of the parties in this case, substantial evidence supports
the District Court's conclusion.  Further, the findings show the court
considered all factors listed in § 40-4-212, MCA.

¶34  Like the Court in Otto, the District Court here considered the factors set
forth in § 40-4-212, MCA, and made appropriate findings.  A complete examination of
the record, much
of which is set out in the beginning of this opinion, reveals that substantial,
credible evidence
exists to support the court's findings regarding custody.  Both Curtis and Sandee
presented
evidence to the court regarding the best interests of the children.  The District
Court found
Curtis' evidence more substantial and credible.  Again, the credibility of witnesses
and the
weight to be afforded their testimony is a matter left to the sound discretion of
the district
court.  Keebler, 807 P.2d at 1357.

¶35  Sandee next argues that in her effort to regain custody of the children after
the court's
September 19, 1996 temporary custody order, the court erred by imposing on her a
higher
threshold showing of changed circumstances than is normally required under § 40-4-
219,
MCA.  Sandee cites no legal authority for her argument.  Rather, her argument is
supported
only by an assertion that the District Court was "predisposed" to rule against her
on the issue
of custody.  Sandee cites the following language as evidence of the court's
predisposition to
rule against her:
     Court:   It sounds like she's really unhappy with my decision.  Let's get the
     thing decided and march over to Helena and get seven other judges for the
     second opinion.  That's the way to handle this, Counselor, not come running
     back at me every three weeks with a request to change this thing.  Get it
     resolved.  Get my decision.  If you don't like it, appeal it.

¶36  This language was part of the court's November 13, 1996 hearing on Sandee's
motion
for change of temporary custody and partial distribution of assets.  An examination
of the
record indicates that the above language appears in the larger context of an overall
admonition by the court to the parties to refrain from re-litigating the issues.
First, the court
was informed by Curtis' counsel that both parties had already stipulated that the
hearing held
September 18 and 19, 1996, would be the only custody hearing in the matter.  Second,
the
court expressed dismay over discussing a change of temporary custody and partial
distribution of assets when the parties had not yet submitted their proposals for
division of

property and custody. The court stated that it would not engage in a "piecemeal" decision
regarding distribution of property and custody, because that approach had been outlawed by
the Montana Legislature a long time ago.

¶37 In our view, the above language evidences only the court's admonition to Sandee that
she follow proper procedure. Nothing in the record indicates to us that the court was biased
against Sandee at any time during the proceedings. We hold that the court's designation of
Curtis as the primary residential custodian was not clearly erroneous.

Issue 3

¶38 Did the District Court err in its award of child support?

¶39 Child support obligations are determined in accordance with the factors set out in §
40-4-204, MCA, and the uniform child support guidelines, located in Title 46, Chapter 30,
subchapter 15 of the Administrative Rules of Montana. Section 40-4-204(3)(a), MCA, provides:

> The guidelines must be used in all cases . . . . The amount determined under
> the guidelines is presumed to be an adequate and reasonable support award,
> unless the court finds by clear and convincing evidence that the application of
> the standards and guidelines is unjust to the child or to any of the parties or
> that it is inappropriate in that particular case.

If a district court deviates from the amount of child support determined under the guidelines,
it must make specific findings in writing to explain its calculation of child support and
reasons for deviating from the guidelines. Section 40-4-204(3)(b), MCA; In re Marriage of
Brandon (1995), 271 Mont. 149, 152, 894 P.2d 951, 953.

¶40 Curtis submitted to the court a financial affidavit listing his purported income, assets,
and expenses. Curtis' figures were based on his 1997 projected income of $42,203 and
Sandee's imputed income of $20,800 based on wages as a licensed truck driver. Sandee
refuted Curtis' calculations by submitting to the court an exhibit showing Curtis' gross
income based on a four-year average with depreciation added back to gross income. Sandee
based her imputed income on the minimum wage she was earning in her janitorial position.

¶41 Both Curtis and Sandee submitted child support guidelines worksheets used to
calculate appropriate child support obligations for the parties. Curtis claimed

four children
required support, while Sandee claimed there were only three children who needed
support.
 Sandee argued that although C.K. would be living with Curtis, he should not be
considered
in the child support calculations because he was an emancipated child.

¶42  In its Finding of Fact 25, the District Court found that because C.K. was
emancipated,
Sandee should be required to pay child support to Curtis for only three children.
The court
determined Sandee's child support obligation to be $180 per month.  The court stated
it
reached this figure by adopting the sum of Curtis' net income from his worksheet and
proposal, adopting the sum of Sandee's net income from her worksheet and proposal,
and
adopting Curtis' calculation for health insurance.

¶43  Sandee argues the court erred in its calculation of the parties' child support
obligations
on several grounds.  First, Sandee contends that Curtis' gross income should have
been
determined by averaging his income over the years 1992-1995, rather than projecting
his
1997 income.  As support for her contention, Sandee cites § 46.30.1515(3)(a), ARM,
which
provides that "seasonal employment or fluctuating income should be averaged over a
period
sufficient to accurately reflect the parent's earning ability."  We reject Sandee's
contention.

¶44  Section 46.30.1515(3), ARM, expresses a preference that gross income and
expenses
be annualized "to avoid . . . skewed application of the guidelines based on
temporary or
seasonal conditions."  However, the administrative rule specifies two methods of
annualizing: subpart (a) recited above, and subpart (b) which states "current income
or
expenses may be projected when a recent increase or decrease in income is expected to
continue for the foreseeable future."  The court properly utilized method (b),
projected
income, because it found a decrease in income was expected to continue for the
foreseeable
future.  In Finding of Fact 16, the court stated:
     Petitioner's [Curtis'] vocations, skills, and employability indicate that he is
     capable of earning $43,202.96 in 1997.  Petitioner's opportunity to acquire
     income or assets in the future is presently limited because of his
responsibility
     of rearing and supporting the minor children of the parties and is moderate for
     the future following the rearing of the minor children because of the extreme
     physical requirements and inherent dangers found in the drilling and blasting

business.  Petitioner has no other sources of income.

Sandee does not contest this particular finding.  Under these circumstances, we hold that the
court did not abuse its discretion in determining Curtis' gross income based on his projected
1997 earnings and expenses.

¶45  Second, Sandee argues that the court should not have included depreciation in Curtis'
allowable deductions from gross income.  Sandee cites § 40.30.1508(1)(c), ARM, for the rule
that depreciation is generally not deductible from gross income, except for cases in which
"economic necessity" is shown.  Sandee argues Curtis failed to show sufficient economic
necessity to qualify for the exception.  We do not agree.

¶46  Finding of Fact 16, quoted above, reflects the court's consideration of a decrease in
Curtis' income in both the near and distant future, and the fact that he had no other sources
of income.  Sandee presented no evidence to the District Court refuting these facts.  We
cannot place the trial court in error for a ruling or procedure in which the appellant
acquiesced, participated, or to which the appellant made no objection.  In re Marriage of
Smith (1990), 242 Mont. 495, 501, 791 P.2d 1373, 1377.  We conclude the court did not
abuse its discretion in deducting depreciation from Curtis' gross income.

¶47  Finally, Sandee argues that her imputed income should not have included a $3110
federal income tax earned income credit.  She argues that because she was not awarded
residential custody of the minor children, she is ineligible for the tax credit and, therefore,
the tax credit should be excluded from her imputed income.  In his brief to this Court, Curtis
conceded this issue and admitted that Sandee's imputed income was overstated by the
amount of $3110.  Therefore, we reverse and remand this issue to the District Court for its
re-calculation of Sandee's child support obligation.

                                        Issue 4

¶48  Did the District Court err in declining to award Sandee rehabilitative maintenance?

¶49  Spousal maintenance is warranted only if the spouse seeking maintenance lacks
sufficient property to provide for his reasonable needs, and is unable to support himself
through appropriate employment.  Section 40-4-203(1), MCA.  In deciding whether a spouse
meets this criteria, a court must consider the following factors:

(a) the financial resources of the party seeking maintenance including marital property apportioned to him, and his ability to meet his needs independently, . . .;

(b) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(c) the standard of living established during the marriage;

(d) the duration of the marriage;

(e) the age and the physical and emotional condition of the spouse seeking maintenance; and

(f) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

Section 40-4-203(2), MCA.

¶50  The District Court ultimately concluded that Sandee did not meet the necessary criteria for spousal maintenance.  In reaching its conclusion, the court relied on findings already discussed herein concerning division of property, custody, and child support, in addition to the following:

17.  That Respondent [Sandee] is employed part-time by a cleaning service and earns a salary of $5.50 per hour.  Respondent has a high school education.  Respondent's vocational skills and employability indicate that she is capable of earning considerably more in the future, if she completes her education at the Salish and Kootenai College.  Respondent has taken computer and bookkeeping courses and has successfully completed a truck driving course and has a commercial driving license.  Respondent's opportunity to acquire income or assets in the future is average.  Respondent has no other sources of income.

22.  That Respondent [Sandee] has sufficient property, following the division of the marital estate as ordered herein, to provide for her reasonable needs, and Respondent is able to support herself through appropriate employment.

¶51  Sandee argues that no substantial evidence exists to support the court's denial of spousal maintenance.  First, Sandee argues that the trailer residence she was awarded was not income-producing property.  Sandee points to the appraiser's testimony that the trailer was worth nothing.  However, a closer look at the record reveals that the appraiser testified that although the trailer itself had no value, the land on which the trailer was situated was valued at $37, 500.  The appraiser based this value on the facts that the land was located on a high water table, it had an existing septic system, and it could easily accommodate a house.  Further, Curtis points out that Sandee testified she was not living at the trailer residence, but at another residence in Polson.  Sandee did not present evidence that the trailer

residence
could not be rented.  We also note that Sandee was awarded several vehicles, valued at a total
of $27,000, and a camper carrying a debt of only $3000.  Under these facts, we hold that
there existed substantial evidence to support the court's finding that Sandee possessed
sufficient property to provide for her needs.

¶52  Next, Sandee argues that despite having taken computer and bookkeeping courses, having successfully completed a truck driving course, and having a commercial driving license, her vocations and skills do not allow her to support herself.  Sandee points to
testimony of the college registrar who stated that the computer courses Sandee took did not
add up to a "degree" in computers.  She also points to Curtis' testimony that she "didn't have
what it took" to drive the family business trucks.  Sandee argues that due to her lack of
employability, she is entitled to rehabilitative maintenance for a period sufficient to procure
vocational training.  We reject Sandee's argument.

¶53  Sandee's college transcript shows that Sandee took twelve computer and accounting
courses and received A's and B's in all of them.  She completed a truck driving course and
received A's and B's.  Although Sandee's instructor noted Sandee needed to practice and
work on her truck driving skills, he scored her a B on the truck driving test.  Again, we note
that the credibility of witnesses and the weight to be afforded their testimony is a matter left
to the sound discretion of the district court.  Keebler, 807 P.2d at 1357.  We hold substantial
evidence existed to support the court's finding that Sandee was able to support herself
through appropriate employment.  The court's denial of rehabilitative spousal maintenance
to Sandee was not clearly erroneous.

¶54  We affirm in part, reverse in part, and remand to the District Court for further findings, regarding the parties' child support obligations, consistent with this opinion.

/S/  WILLIAM E. HUNT, SR.

We Concur:

/S/   JAMES C. NELSON
/S/   JIM REGNIER
/S/   W. WILLIAM LEAPHART
/S/   TERRY N. TRIEWEILER