No. 01-871

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 124N

In Re the Marriage of:

TAMMY DIANE GALLAGHER,

        Petitioner and Appellant,

and

MARK ROBERT GALLAGHER,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                   In and for the County of Flathead, Cause No. DR-96-519 A,
                   The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Katherine P. Maxwell, Johnson, Berg, McEvoy & Bostock, PLLP, Kalispell,
                Montana

        For Respondent:

                (No Respondent's brief filed.)

                            Submitted on Briefs:  October 24, 2002

                                   Decided:  April 29, 2003

Filed:

_____
                     Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2      Petitioner Tammy Gallagher petitioned the District Court for the Eleventh Judicial District in Flathead County for dissolution of her marriage to Respondent Mark Gallagher. After trial before a special master, the District Court dissolved their marriage and distributed the marital estate.  Tammy appeals the District Court's distribution of the marital estate.  We affirm the judgment of the District Court.

¶3      There are seven issues on appeal:

¶4      1.  Did the Special Master abuse her discretion when she granted Mark's motion *in limine* to exclude discovery material that Tammy had failed to disclose?

¶5      2.  Should this Court consider the issues Tammy has raised for the first time on appeal?

¶6      3.  Did the Special Master err when she found that the proceeds from the sale of the Yellowstone home were Mark's premarital property?

¶7      4.  Did the Special Master abuse her discretion when she valued the assets that Tammy took when the parties separated?

¶8      5.  Did the Special Master abuse her discretion when she excluded assets acquired

2

after separation from the marital estate but included some liabilities acquired after separation in the marital estate?

¶9    6. Did the Special Master abuse her discretion when she failed to award Tammy one-half of the income from the parties' rental property and a portion of the appreciation of the marital real estate?

¶10    7. Did the Special Master abuse her discretion in her overall distribution of the marital estate?

FACTUAL AND PROCEDURAL BACKGROUND

¶11    Tammy Taylor and Mark Gallagher met in 1990 and shortly thereafter, on December 26, 1990, moved into Tammy's rental apartment and daycare business in Bend, Oregon, where they lived for several months, until May 1990. Mark, who was self-employed in residential construction, helped complete the "Yellowstone home" in Bend, Oregon, and purchased the home for $87,000 in May 1990 with premarital assets. Mark did some finish work on the house, apparently with some help from Tammy, and in the fall of 1991, they sold the Yellowstone home and earned a $33,000 profit.

¶12    In autumn of 1991, prior to the couple's marriage, Mark was indicted on a charge of sexual abuse of a child from his prior marriage. Mark was later acquitted of the charge but incurred approximately $45,000 for legal fees that Mark paid through proceeds from the sale of the Yellowstone home and a personal loan that was repaid during the parties' marriage.

¶13    Mark and Tammy were married on December 28, 1991. After moving from the Yellowstone home, Tammy and Mark lived in an apartment where Mark worked until they

3

purchased the "Minnetonka home" in January 1992. Tammy quit her daycare business, obtained a real estate license, sold real estate, and worked part-time managing the accounting for Mark's business.

¶14 In November 1994, Mark and Tammy sold the Minnetonka home and moved to Columbia Falls, Montana, where they purchased a rental duplex property that rented for $800 per month. They later purchased the current marital home in the spring of 1995 for $90,000. Tammy sold real estate in Montana until she became pregnant in 1995 and restarted a daycare business. Mark and Tammy had a child, T.G., on February 12, 1996. Shortly thereafter, the parties separated and Tammy returned to Oregon with T.G., and filed a petition for dissolution of their marriage on August 29, 1996.

¶15 On March 21, 1997, the District Court appointed Special Master Therese Fox Hash to preside over the issues of custody, support and distribution of the marital estate. From the time that the parties separated, they vigorously disputed visitation and custody of T.G., and Tammy alleged that Mark had sexually abused T.G. during supervised visitation in December 1998. Although charges were filed, they were later dropped on condition that Mark obtain a sexual offender evaluation. That was done.

¶16 On July 2, 1997, Mark requested discovery regarding numerous financial documents, and renewed his request on October 2, 1997, when Tammy had failed to produce the documents. On December 4, 1997, Tammy's counsel asked to be permitted to withdraw, citing "lack of cooperation." That request was granted. Shortly thereafter, Mark filed a motion to compel discovery of the requested documents, which the District Court granted.

The court ordered that Tammy produce the requested documents by February 1, 1998, or face sanctions. Tammy did not produce the documents, and on March 24, 1998, the scheduled first day of trial, the Special Master found Tammy in contempt for her failure to produce discovery. Since the Special Master was unable to conclude the trial that day, she continued the trial until August 18 and 19, 1998.

¶17    Both parties obtained new counsel before trial resumed. Tammy's counsel filed a notice of appearance on April 15, 1998, and Mark's counsel filed a notice on June 26, 1998. Despite the change of counsel, however, Tammy failed to produce the discovery subject to the motion to compel, and on August 11, 1998, Mark filed a motion *in limine* to exclude the non-disclosed discovery. Tammy responded that the motion should be denied because of her difficulty obtaining counsel and that her new counsel had offered Mark's counsel access to any discovery stored at his office, but that the offer was rejected. Prior to trial on August 18, 1998, the Special Master discussed the discovery issue with counsel and granted Mark's motion to exclude the non-disclosed discovery.

¶18    The Special Master resumed the trial on August 18 and 19, 1998, on all of the issues before it, and with respect to the marital estate, received Mark's and Tammy's testimony in addition to various financial documents presented by Mark and Tammy, and previous financial disclosures filed by the parties. After trial, the proceedings were stalled while the parties resolved Mark's requests for visitation with T.G. and while Mark obtained and paid for a sexual offender evaluation. After the parties resolved some of the visitation issues and Mark paid for the evaluation, the parties agreed to a status conference to determine the final

5

distribution of the marital estate and the parties submitted final disclosures with respect to income, assets, and liabilities on October 2, 2000. After the disclosure, Mark's attorney withdrew from representation on October 30, 2000.

¶19 On November 8, 2000, the Special Master entered her Findings of Fact and Conclusions of Law. The Special Master found that Tammy's premarital assets were $26,464, with premarital debts of $6,840, and that Mark's premarital assets were $88,700 with no premarital debts. The Special Master specifically found that Mark was entitled to a credit of $33,000 for the proceeds from the sale of the Yellowstone home because "the funds to purchase that home were derived substantially from [Mark's] assets and efforts."

¶20 The Special Master found that, as of the date of the trial, the total marital assets were $264,784.00, and that the total marital debts were $157,967.81. The Special Master included the following debts:

| | |
|---|---|
| Columbia Falls home | $ 69,343.83 |
| Hungry Horse duplex | 18,225.81 |
| Bank loans & credit cards, (including debts to Ford Visa, Dial Bank, and Costco) | 28,760.63 |
| Prudential life insurance loan | 5,826.27 |
| Other debts | 35,811.27 |

From this, the Special Master found the net marital estate was $106,816.19.

¶21 The Special Master then provided values, using the date of trial in 1998, for marital assets that the respective parties had taken with them at separation, and specifically "disregard[ed] any items acquired after the parties separated." The Special Master valued and distributed the assets as follows:

Mark                                    Tammy

6

| | | | |
|---|---|---|---|
| Duplex | $ 70,000 | Household items | $ 18,875 |
| Marital home | 90,000 | Daycare items | 1,310 |
| Gallagher Const. equipment | 55,889 | 1987 Ford Tempo | 2,200 |
| Other personal property | 25,083 | Other personal property | 1,427 |
| Total distributed assets | $ 240,972 | | $ 23,812 |

The Special Master added the additional finding that it was impossible from testimony to determine the amount of cash that Tammy took with her when the parties separated.

¶22  The Special Master then considered Mark's payments on the marital debt and found that between the parties' separation in August 1996 and trial that Mark had paid $35,031.52 against the marital debt, including the following payments:

| | |
|---|---|
| Duplex rental (principal payments) | $ 16,027.41 |
| Marital home (principal payments) | 1,912.11 |
| Credit cards (interest payments) | 7,200.00 |
| 1993 Ford truck | 9,892.00 |

¶23  The Special Master also found that Mark had paid $49,596.00 toward marital debt since trial, which included the following payments:

| | |
|---|---|
| Personal credit cards | $ 6,631.00 |
| Business credit cards | 5,876.00 |
| Marital home (principal payments) | 1,606.00 |
| Duplex (principal payments) | 13,659.00 |
| Business vehicles | 15,106.00 |
| Mobile home | 1,792.00 |
| Property taxes | 4,926.00 |

The Special Master further discussed Mark's payments in Finding # 36:

> [Mark] has paid a total amount of $84,627.52 on various marital debts since the parties separated, which included payment on his business credit cards, and personal credit cards. He has maintained the marital home in Columbia Falls, Montana, and the rental duplex in Hungry Horse, Montana, without contribution from [Tammy] towards the marital assets or debts. Since separation, then, he has paid more in marital debt then [sic] the value of the estate.

7

¶24 The Special Master then made three additional specific findings:

37. [Mark] has also incurred substantial legal fees, fees for evaluations and expenses, totaling in excess of $20,000.00, relating to the divorce, along with defending himself in the State of Oregon for the abuse charge.
38. Since the parties separated and the last hearing in July, 2000, [Tammy] has incurred attorney fees, living expenses, and acquired a newer vehicle through a bank loan.
39. Any increase of value in the marital real property from the date the parties separated to present, is solely due to the efforts of [Mark], or the effects of inflation, and not due to any contribution on the part of [Tammy]. Thus, the Special Master has reflected the value of the assets and debts as of the date of trial, in August, 1998.

¶25 The Special Master then distributed the marital estate by awarding each party the marital assets they left with at separation and by distributing the entire marital debt to Mark. According to the Special Master's findings, Mark and Tammy received a net distribution of $83,004.19 and $23,812.00, respectively.

¶26 Mark and Tammy filed objections to the Special Master's findings on November 17, 2000, and the District Court ordered a hearing on the matter that was later held on April 3, 2001, and requested the parties to submit proposed findings regarding their objections. Both parties submitted their proposed findings. The day after submitting Tammy's proposed findings, Tammy's counsel moved to withdraw as counsel, declaring that Tammy had failed to make payments as agreed. The District Court allowed the withdrawal on June 20, 2001. On the issue of Tammy's objections, the District Court ordered that "[t]he matter is remanded to the Special Master for further consideration upon [Tammy's objections], [Mark's] Response thereto, and the record thus created."

¶27 The Special Master issued amended findings of fact and conclusions of law, which

8

addressed some of Tammy's objections. However, other objections were denied.

¶28 On September 10, 2001, Tammy, appearing *pro se*, submitted objections to the Special Master's amended findings, and attached to it several selected parts of the transcripts. However, the District Court did not consider Tammy's objections and, on September 25, 2001, issued an order adopting the Special Master's amended findings of fact and conclusions of law, and issued a decree of dissolution.

¶29 Tammy resubmitted her objections to the Special Master's amended findings on October 2, 2001, and moved to set aside the final decree on October 22, 2001, however, based on her notice of appeal on October 30, 2001, the District Court denied her objections and motion as moot. The District Court additionally found that her objections were not recognized pursuant to Rule 53, M.R.Civ.P. We now consider Tammy's appeal.

STANDARD OF REVIEW

¶30 We review a district court's decision to admit or exclude evidence to determine whether the court abused its discretion. *Hiebert v. Cascade County*, 2002 MT 233, ¶ 22, 311 Mont. 471, ¶ 22, 56 P.3d 848, ¶ 22. We apply the same standard to a district court's decision to grant a motion *in limine* to exclude evidence. *City of Helena v. Lewis* (1993), 260 Mont. 421, 426, 860 P.2d 698, 700.

¶31 We review a district court's division of marital property to determine whether its findings of fact are clearly erroneous. *Kovarik v. Kovarik*, 1998 MT 33, ¶ 20, 287 Mont. 350, ¶ 20, 954 P.2d 1147, ¶ 20. When a district court appoints a special master, the district court "shall accept the master's findings of fact unless clearly erroneous." Rule 53(e)(2),

9

M.R.Civ.P. We will conclude that a finding of fact is clearly erroneous only when "it is not supported by substantial evidence, the trial court misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed." *Kovarik*, ¶ 20 (citation omitted). "Substantial evidence" is "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Kovarik*, ¶ 20 (citing *Barrett v. Asarco Inc.* (1990), 245 Mont. 196, 200, 799 P.2d 1078, 1080).

¶32 Where the district court's findings of fact are not clearly erroneous, we will decide whether the district court abused its discretion when it distributed the marital estate. *Kovarik*, ¶ 21. The standard for an abuse of discretion is "whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *In re Marriage of Hayes*, 2002 MT 281, ¶ 13, 312 Mont. 440, ¶ 13, 60 P.3d 431, ¶ 13 (citation omitted). When distributing the marital estate:

> A district court focuses on the overall distribution of the entire marital estate and not an item by item accounting. *See In re Marriage of Baer*, 1998 MT 29, ¶ 36, 287 Mont. 322, ¶ 36, 954 P.2d 1125, ¶ 36. Moreover, we do not attempt on appeal to review every element of a complex property distribution.

*In re Marriage of Hochhalter*, 2001 MT 268, ¶ 37, 307 Mont. 261, ¶ 37, 37 P.3d 665, ¶ 37. In addition, while a district court must equitably distribute the marital estate, it need not equally distribute the marital estate. *Marriage of Walls* (1996), 278 Mont. 413, 416, 925 P.2d 483, 485.

DISCUSSION

ISSUE 1

10

¶33 Did the Special Master abuse her discretion when she granted Mark's motion *in limine* to exclude discovery material that Tammy had failed to disclose?

¶34 Tammy first contends that the Special Master abused her discretion when she granted Mark's motion *in limine* to exclude potential evidence that Tammy had failed to provide during discovery. She contends that her noted problems obtaining counsel and her counsel's subsequent offer to allow Mark's counsel to visit her office to browse Tammy's file for non-privileged, non-disclosed documents should excuse her from the "harsh remedy" of exclusion that the Special Master imposed. Tammy contends that the excluded documents included tax returns and numerous financial records from 1990 to 1997 that were critical to the issues of the equitable distribution of the marital estate and that their exclusion subjected her to substantial injustice.

¶35 We have held that district courts have discretionary power to control the manner in which discovery is conducted. *State of Or. ex rel. Worden v. Drinkwalter* (1985), 216 Mont. 9, 12, 700 P.2d 150, 152. Rule 53(c), M.R.Civ.P. recognizes similar authority for masters. Within the master's authority, then, is the imposition of sanctions when parties fail to adhere to discovery guidelines. *See* Rule 37, M.R.Civ.P; Rule 53(c), M.R.Civ.P.. We generally presume that the decision of a district court regarding sanctions for abuse of discovery is correct, *Cass v. Composite Industries of America*, 2002 MT 226, ¶ 11, 311 Mont. 406, ¶ 11, 56 P.3d 322, ¶ 11, and generally defer to the decision of the district court (or master) "because [it] is in the best position to know whether parties are disregarding the rights of opposing parties in the course of litigation and which sanctions for such conduct are most

11

appropriate." *McKenzie v. Scheeler* (1997), 285 Mont. 500, 506, 949 P.2d 1168, 1172.

¶36    In this case, the record shows that Tammy failed to produce the documents subject to the motion *in limine* despite two requests, a motion to compel, and a finding of contempt, all of which took place over the course of more than one year. The fact that these exhibits may have been critical to Tammy illustrate why their discovery was important to Mark. Furthermore, the offer of Tammy's counsel to allow Mark's counsel to peruse her records was not a substitute for the specific production that had been requested.

¶37    Accordingly, we conclude that the Special Master did not abuse her discretion when she granted Mark's motion *in limine*.

ISSUE 2

¶38    Should this Court consider the issues Tammy has raised for the first time on appeal?

¶39    Tammy challenges numerous findings of fact made by the Special Master and adopted by the District Court for the first time on appeal. Tammy claims the Special Master erred when she failed to dissipate Mark's share of the marital estate due to legal fees he incurred defending sexual abuse allegations in 1992. In addition, Tammy contends the Special Master erred when she made or failed to make findings regarding certain debt payments Mark made on income-generating assets, unspecified amounts of alleged marital credit card debt incurred by Tammy, Mark's and Tammy's respective earning capacities, and Tammy's entitlement to maintenance.

¶40    We have held that, as a general rule, an issue raised for the first time on appeal is untimely and cannot be considered. *Akhtar v. Van de Wetering* (1982), 197 Mont. 205, 209,

12

642 P.2d 149, 152. We have applied a similar bar to proceedings involving masters:

> Rule 53(e)(2), M.R.Civ.P., is clear that, in nonjury actions such as this, "the [trial] court shall accept the master's findings of fact unless clearly erroneous." The burden of challenging the master's findings is on the party objecting; the related burden of establishing that a finding is clearly erroneous also is on the party objecting. The intent–implicit, but clear–of Rule 53(e)(2), M.R.Civ.P., is that all objections to a master's report must be timely made in a party's written objections. *In the future, objections not made to the district court at that juncture will not be entertained by this Court on appeal.*

*In re Marriage of Doolittle* (1994), 265 Mont. 168, 171-72, 875 P.2d 331, 334 (emphasis added). Accordingly, we will not address the issues Tammy raises for the first time on appeal.

## ISSUE 3

¶41 Did the Special Master err when she found that the proceeds from the sale of the Yellowstone home were Mark's premarital property?

¶42 Tammy contends that the Special Master erred by crediting the entire sale proceeds from the Yellowstone home to Mark, because she ignored Tammy's testimony regarding her contributions to the purchase of the Yellowstone home, including that she let Mark live with her rent-free at her $650-per-month apartment for five months to save for the down payment, that she sold her car for $2,000 and held a garage sale to contribute to the down payment, and that she helped complete "finish work" on the home.

¶43 However, other testimony contradicts Tammy's contention. Mark testified that he had worked substantially on the house as a subcontractor, that he purchased the house with his own funds, and that he did all of the finishing work on the house. He testified that Tammy was of little help with the finishing work. He also testified that the money Tammy gave him

13

from the sale of the car was to reimburse him for work he did on the car so that it would be marketable. In addition, no testimony established the value added by the "finish work" on the Yellowstone home. Finally, Tammy's own testimony regarding the garage sale indicates that the sale occurred *after*, not prior to, the purchase of the Yellowstone home.

¶44    We cannot conclude that the Special Master clearly erred when she found that the entire proceeds from the sale of the Yellowstone home were Mark's pre-marital property.

ISSUE 4

¶45    Did the Special Master abuse her discretion when she valued the assets that Tammy took when the parties separated?

¶46    Tammy contends that the Special Master erred when she valued the personal items distributed to Tammy, despite Tammy's testimony regarding their value. She objects that the Special Master valued her office equipment at $850, rather than $398, her household items at $18,875, rather than $11,835, and her car at $2,200, rather than $2,000.

¶47    We have held that a district court has "the discretion to adopt any reasonable valuation of property supported by the record." *Siefke v. Siefke*, 2000 MT 281, ¶ 20, 302 Mont. 167, ¶ 20, 13 P.3d 937, ¶ 20. In addition, a presumption exists in favor of the district court's valuations of marital property. *In re Marriage of Gochanour,* 2000 MT 156, ¶ 34, 300 Mont. 155, ¶ 34, 4 P.3d 643, ¶ 34.

¶48    The Special Master found that:

> In assigning values to any of these following items, the Special Master attempted to adopt the values given by the party who initially acquired said item; however, to the extent that testimony supported a different conclusion, another value may be assigned. Both parties attempted to under- or overvalue

14

an item or debt, depending on the impact to the party.

Thus, the Special Master was confronted with adopting Tammy's testimony, which undervalued these items, or Mark's testimony, which overvalued them. We conclude that the Special Master did not abuse her discretion when she valued the assets distributed to Tammy.

ISSUE 5

¶49   Did the Special Master abuse her discretion when she excluded assets acquired after separation from the marital estate but included some liabilities acquired after separation in the marital estate?

¶50   Tammy contends that the Special Master clearly erred when she excluded several assets from the marital estate that Mark acquired after separation, most notably a truck, a snowmobile, and a snowblower, while she did include several debts that Mark incurred after separation as marital debt.

¶51   With respect to the calculation of the marital estate, we have recognized that "[t]he well-settled rule in Montana is that absent unique circumstances, the marital estate should be valued at or near the time of dissolution." *In re Marriage of Lopez* (1992), 255 Mont. 238, 244, 841 P.2d 1122, 1125. However:

> Achieving an equitable apportionment of property is more important than designating the moment at which the court should value the property. "The filing of a petition, trial of the matter, or even the granting of the decree of dissolution does not control the proper point of evaluation by the District Court."

*In re Marriage of Geror*, 2000 MT 60, ¶ 14, 299 Mont. 33, ¶ 14, 996 P.2d 381, ¶ 14 (quoting

15

*Lippert v. Lippert* (1981), 192 Mont. 222, 226, 627 P.2d 1206, 1208).  In *In re Marriage of Wagner* (1984), 208 Mont. 369, 378, 679 P.2d 753, 757-58, we stated:

> To include in the valuation of the marital estate any accumulation of financial wealth or, conversely, the increase in financial liabilities of either spouse subsequent to the termination of the "marital relationship" may effectuate an injustice and frustrate the intended purpose of division of marital property.

¶52    In this case, we first conclude that there are unique factual circumstances such that it was appropriate for the Special Master to exclude the assets acquired by the parties after separation.  First, the record is abundantly clear that, after the petition for divorce was filed, Mark and Tammy completely severed their "marital relationship."  Tammy moved to Oregon with T.G. and Mark was left with a substantial portion of the marital assets and all of the marital debt to which Tammy contributed nothing after August 1996.  Second, neither party alleges nor is there any evidence that any of the post-separation assets were acquired by the sale of marital assets.  The record suggests instead that the assets were acquired through either Mark's efforts or with credit that was not included as part of the net marital liabilities.

¶53    For these reasons, we conclude that the Special Master did not abuse her discretion when she excluded assets acquired after the parties separated from her calculation of the net marital estate.

¶54    In addition, Tammy contends that the Special Master erred when she included debts that Mark incurred after separation in her calculation of the net marital debt.

¶55    After reviewing the testimony, we conclude that the Special Master did include some debts incurred by Mark after separation, including debts from a Costco credit card ($1,597.21), a Dial Bank credit card, ($1,560.13), and approximately several thousand

16

dollars from a Prudential life insurance loan (up to $5,828.77). However, Tammy cites no authority that forbids the Special Master from considering debts incurred after the parties separated. To the contrary, § 40-2-202(1), MCA, specifically provides that a court may equitably distribute each asset and liability of the parties, and in our decision in *Lippert*, 192 Mont. at 226, 627 P.2d at 1208, we remarked that "[t]he time for proper valuation cannot be tied to any single event in the dissolution process." We suggested that in certain circumstances, "selection of a single evaluation point for determining net worth of the parties could create an inequitable disposition." *Lippert*, 192 Mont. at 226-27, 627 P.2d at 1208.

¶56   Here, we note that Mark was shouldered with the entire marital debt burden between the time of separation and the time that the Special Master issued its findings of fact and conclusions of law. To require that Mark, in an effort to preserve the substantial marital assets, incur separate non-marital debt would be unfair. In addition, we point out that § 40-2-106, MCA, provides that a spouse may be liable for "expenses for necessaries of the family," and to the extent that Mark likely incurred some of this additional debt as a result of his need to provide for "necessaries" while paying on the substantial marital debt, we cannot conclude that the Special Master abused her discretion when she credited some debts incurred solely by Mark to the marital estate.

ISSUE 6

¶57   Did the Special Master abuse her discretion when she failed to award Tammy one-half of the income from the parties' rental property and a portion of the appreciation of the marital real estate?

17

¶58    Tammy also contends that the Special Master clearly erred when she failed to award Tammy one-half of the rental value of the duplex, when she failed to properly credit Tammy for the fact that Mark lived "rent-free" at the marital home, and when she failed to award Tammy anything for appreciation of the marital real property after the trial in August 1998. She contends that these omissions were inequitable since Mark has received credit for payments he made on the marital real property debt despite her allegation that Mark received a net income from the rental properties even after he made such debt payments.

¶59    In response to Tammy's objections, the Special Master concluded that Tammy's failure to provide her share of the mortgage payments and other costs should preclude her from a share of the rental value.

¶60    We agree with the Special Master's conclusion that it would be inequitable at this point for Tammy to contend, after abandoning her obligations to the parties' marital property, that she did not adequately profit from that property. Therefore, we conclude that the Special Master did not abuse her discretion when she declined to give Tammy a share of the rental value of the home and duplex property.

¶61    Tammy also contends that the Special Master erred by failing to award her a share of the appreciation of the marital property from the time of trial until the time of the Special Master's findings of fact. The Special Master stated, however, in her amended findings of fact that:

> [T]here was credible evidence regarding the value of the real property as of the time of the trial. The value at that time would reflect any pre-separation contribution on the part of [Tammy]. [Mark] continued to make the payments on the real property and continued to maintain and improve the property,

18

without contribution from [Tammy] and while paying on the marital debt.

For reasons that we have expressed above, we agree with the conclusion of the Special Master and cannot conclude that it was an abuse of discretion to deny Tammy a credit for the appreciation of marital property when she failed to contribute to the preservation or maintenance of the property.

## ISSUE 7

¶62    Did the Special Master abuse her discretion in her overall distribution of the marital estate?

¶63    Based on Tammy's previously stated objections, she contends that the Special Master erred and abused her discretion when she distributed the marital estate.

¶64    After reviewing the Special Master's findings and calculations regarding the parties' marital assets and liabilities, we conclude that the Special Master's distribution was not inequitable.  As stated previously, Mark entered the marriage with almost $89,000 in assets while Tammy had $26,000 in assets and $7,000 in debts.  At the time of trial, the marital assets totaled $265,000, with marital liabilities of $158,000.  After the distribution of the assets and liabilities, Mark obtained a net estate of $83,000, while Tammy obtained a net estate of $23,000.  Given the additional fact that Mark paid an additional $84,000 in net marital debt to achieve the *status quo* of the parties prior to their marriage, we conclude that the Special Master did not abuse her discretion when she distributed the marital estate.

¶65    Finally, we need not address Tammy's contention that the Special Master erred when she noted legal fees that Mark paid in this matter.  The Special Master specifically stated that

"[i]n the allocation of marital debt and assets, there was no consideration of 'debiting' for attorney fees, regardless of the parties incurring same." Nor does there appear any evidence to suggest that this was not the case.

¶66 For the foregoing reasons, the judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ JAMES C. NELSON

Justice Jim Rice dissenting.

¶67 I respectfully dissent. The Court does some impressive footwork in order to affirm the District Court's granting the proceeds from sale of the marital home to Mark, despite Tammy's contributions (Issue 3); excluding from the marital estate assets acquired by Mark after separation (Issue 5), but including in the estate debts incurred by Mark after separation (Issue 5); and, failing to award Tammy any portion of the marital rental income (Issue 6), which Mark had used to pay down marital debt (Issue 2), and then using Mark's debt reduction to justify the distribution of the estate favoring Mark (Issue 7). Although I concur with the Court's resolution of Issues 1 and 4, I dissent from the remaining issues, as I conclude therefrom that the distribution of the estate was not equitable to Tammy. I would reverse and remand on those issues.

/S/ JIM RICE